IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 17, 2001 Session

## STATE OF TENNESSEE v. SHARON LEMING

**Appeal from the Circuit Court for Humphreys County**
**No. 8864     Robert E. Burch, Judge**

———————————————

**No. M1999-01424-CCA-R3-CD - Filed June 11, 2001**

———————————————

This is Defendant, Sharon Leming's, second appeal as of right to this Court. See State v. Leming, 3 S.W.3d 7 (Tenn. Crim. App. 1998).   In both Defendant's first and second trial, a Humphreys County jury convicted her of premeditated first degree murder.  After the Defendant's initial appeal, this Court reversed and remanded the case for a new trial due to the erroneous admission of testimony regarding statements made by the victim as to his fear of the Defendant.  Following a second trial, the Defendant received a sentence of life imprisonment to be served in the Tennessee Department of Correction.  In this second appeal as of right, the Defendant presents the following issues for our review:1) whether the trial court erred in ruling that the Defendant was mentally competent to stand trial; 2) whether the evidence was sufficient to convict the Defendant of first degree murder; 3) whether the trial court erroneously admitted statements by the Defendant that she would kill her husband before she would allow him to leave her; 4) whether the trial court erred in excluding testimony that the Defendant had stated that she needed a gun to protect herself from friends of the deceased; and 5) whether the trial court erred in denying Defendant's request for a mistrial, when the trial court declined to instruct the jury that a sentence of life with the possibility of parole would require that the Defendant serve a minimum of fifty-one years. Based upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal As Of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Jefre S. Goldtrap, Nashville, Tennessee (on appeal); Lionel R. Barrett, Jr., Nashville, Tennessee (at trial), for the appellant, Sharon Leming.

Paul G. Summers, Attorney General & Reporter; Russell S. Baldwin, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Lisa Donegan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The Defendant was tried for the murder of her husband, Chris Leming, which occurred either late on September 11 or early on September 12, 1995.

Ronnie Toungette, the Humphreys County Sheriff, testified that on the morning of September 12, 1995, Chief John Ethridge called and requested that he come to the Chief's City Hall office in McEwen, Tennessee. Toungette stated that he had former deputy, J.C. Danesworth, accompany him to McEwen. Upon arriving at City Hall, Chief Ethridge introduced Toungette to Chester Duffield, the Defendant's father. Mr. Duffield wanted Toungette and Danesworth to follow him to the home of the Defendant and victim in McEwen, because he was worried about the Defendant. Toungette testified that when they arrived at the house, three cars were in the driveway. He knocked on the door and called out but received no answer. He attempted to enter, but all the doors were locked. He looked through a bedroom window and saw two bodies lying on a bed. Toungette testified that he found a utility step stool, which he used to enter the house through the kitchen window.

Once inside, he checked the other rooms to insure that no one else was in the house. Then, Toungette went directly to the bedroom where he found both the Defendant and the victim lying in bed, with blood surrounding them and with serious head wounds. He stated that he checked the victim, but the victim had no vital signs. However, the Defendant was alive and breathing. Toungette told the Defendant to lie still and that he was getting help for her, but the Defendant only responded with moaning and groaning. He ran outside and instructed Danesworth to call for an ambulance for the Defendant and to call for Life Flight in Nashville. Toungette also requested that Tennessee Bureau of Investigation (TBI) Agent Steve Watkins and the TBI Crime Lab Team be dispatched from Donelson, Tennessee to help with the processing of the crime scene. He testified that, while he was outside, Mr. Duffield asked him what kind of weapon he had found. Toungette testified that when he told Mr. Duffield that he had found a snub-nosed .38 pistol, Mr. Duffield replied, "My God, it's my gun."

Officer Toungette testified that, as they waited for the ambulance, he had Danesworth to take pictures of the house. (Danesworth also took pictures after the ambulance left.) Toungette observed that the victim had a wound behind his ear and the Defendant had damage to her hair and scalp. Specifically, he noticed that part of the Defendant's hair and scalp on the top of her head were missing. He testified that the bed and the Defendant's clothes were soaked with blood. The victim appeared only to have blood near the wound behind his ear, on the pillow where he was lying and on his right arm. Toungette testified that a bloody hand print was on the wall next to the bed. He also discovered a snub-nosed pistol and a purse lying on the floor near the Defendant's side of the bed. A clump of hair was found stuck to the ceiling. On cross-examination, Officer Toungette stated that he did not notice any blood on the handle of the gun. He also stated that the clump of hair on the ceiling was found above the Defendant's head, and it appeared to be the Defendant's hair.

2

Cathy Throgmorton testified that she knew the victim and the Defendant by way of her relationship with the victim's brother, Brian Leming. She stated that the Defendant was very obsessed with the victim. She testified that occasionally, the Defendant had stated that she would kill the victim before she would allow him to leave or divorce her. On cross-examination, Throgmorton acknowledged that she did not tell any TBI agent about the Defendant's prior statements, until some time after the initial investigation of the victim's murder.

Sandra Buck, a neighbor of the Defendant and victim, testified that in late 1994, she and the Defendant were discussing the issue of divorce, when the Defendant stated that she would kill her husband (the victim) before she would let him leave her. She also told the jury that she never told any law enforcement officer about the Defendant's threat, until she came to court. She explained that she did not remember the Defendant's statement initially, but almost ten months later, she recalled the Defendant's statement as she was having a conversation with Brian Leming and Cathy Throgmorton. She said that she did not hear anything out of the ordinary either Sunday night or Monday morning. She also testified that she and her husband were not at home Monday morning, but her son had stopped by to borrow their lawnmower.

John Wallace testified that he and the victim were good friends and had worked together at Riverbend Maximum Security Institution before the victim started working as a guard at Turney Center. Wallace told the jury that, when the victim worked at Riverbend, the Defendant would call frequently, during the victim's shift. He testified that, even after the victim left Riverbend, he would still come to Riverbend on Wednesdays to train, and that the Defendant would call the victim four or more times during the training. Wallace testified that, between September 9th and 11th, 1995, he kept the victim's Winchester 12-gauge semi-automatic weapon stored in the gun cabinet at his house. He further testified that, on the day the victim was killed, he and Tommy Forrester went to the victim's house. He saw the Turney Center Ford Bronco, which the victim drove, parked in the driveway. He also saw two weapons in the back of the Bronco, which the police recovered.

Tommy Forrester testified that he had known the victim for about six months. He met the victim through his cousin, John Wallace. Forrester testified that he had visited the Leming house approximately four or five times. He further stated that he had never had any problems with either the victim or the Defendant.

Kathy Leming testified that she and the victim had been married for thirteen years, before they divorced in 1991. She stated that she and the victim had a thirteen-year-old son named Joshua. She testified that, on the days the victim would either be picking up or dropping off their son at home, the Defendant would call her house leaving messages for the victim to call the Defendant when he arrived at her house. She also said that, whenever she and the victim talked on the phone concerning their son, she would hear the Defendant in the background screaming for the victim to hang up the phone.

Chester Duffield, the Defendant's father, testified that, on September 10, 1995, he drove his truck to the home of the Defendant and victim to help the Defendant move her belongings to his

3

home.  After his truck was fully loaded, he drove back to his house in Nashville.  At some point, his wife, the Defendant, and the victim returned to the Duffield home with more of the Defendant's belongings.  He testified that while they were at his house, the Defendant took his .38 caliber pistol from his truck without his permission and that the weapon was loaded with a variety of bullets. When he asked the Defendant about the gun, in the presence of the victim, she said that she needed the gun to protect herself against the victim's drunk friends, who would be at their house when they went back.  Duffield tried to persuade the Defendant not to go back to the house, but she said that she needed to go back to get some clothes for work the next morning.

Steve Watkins, a former TBI agent assigned to the Defendant's case, testified that when he arrived at the scene the EMT's had already transported the Defendant to the hospital.  He helped Sheriff Toungette in securing the crime scene until the TBI Crime Lab team arrived. He testified that the gunshot residue tests, which they performed on the Defendant and the victim, produced inconclusive results. On redirect, he explained that fluids, such as blood, can wash away any gunshot residue, making the results of the gunshot residue test inconclusive.  The State later called Agent Steve Watkins back to the stand to identify the report of the gunshot residue tests performed on both the Defendant and the victim.  On cross-examination, Watkins testified that any type of liquid substance in which a hand was immersed would affect the reliability of gunshot residue testing. Agent Watkins examined a crime scene photo of the Defendant and the victim, and testified that Defendant's hands appeared to be covered with blood.  He further testified that he took Cathy Throgmorton's statement, in which Throgmorton stated that she had never heard the Defendant say that she would kill the victim before she let him leave her.  Agent Watkins also testified that the Defendant had received a  wound  to the top left of her head.

Dr. Charles Harlan, the medical examiner, performed the autopsy on the victim.  He testified that the cause of the victim's death was a gunshot wound that entered behind his left ear and traveled through the victim's brain.  Dr. Harlan stated that he recovered a .38 caliber bullet from the victim's skull.  He opined that the victim suffered a near gunshot wound, i.e., the muzzle of the gun was twelve to twenty-four inches from the victim's skin when the shot was fired.  Dr. Harlan further testified that the gunshot wound suffered by the victim would have rendered him unconscious upon impact, such that the victim would not have had control over any of his voluntary motions (e.g., walking, talking, or any movement of the arms and legs).  As a result, Dr. Harlan opined that the victim could not have made the bloody handprint that the investigators found on the bedroom wall.

Steve Scott, an agent with the firearms identification section of the TBI Crime Lab, testified as an expert in ballistics and firearms comparison.  He testified that he was one of four  members of the TBI Crime Lab team who collected evidence from the crime scene at the Leming house.  When the team arrived at the scene, Agent Watkins briefed the Crime Lab team and informed them that the Defendant had already been life-flighted to the hospital.  Agent Scott stated that he found a revolver lying on the floor next to the bed, where they discovered the victim and the Defendant.  The team also observed a bloody hand print in the corner of a wall in the bedroom; therefore, they cut and took part of the sheetrock to the lab for fingerprint testing.  However, the hand print lacked the ridge detail needed to identify a specific individual.  The team also collected lead pellets from the

4

carpet, which had been "removed from the shot shell itself and left loose on the floor." Agent Scott further testified that he recovered "a fired copper-jacketed bullet" from inside the pillow, on which the victim was lying. He said that they recovered a pistol from the floor, which contained "two fired cartridges and three live cartridges that had not been fired." He testified that the bullets recovered were made by three different manufacturers. He stated that the fired cartridges and the bullet taken from the bed pillow were fired from the pistol found at the crime scene. He opined that it was possible for the bullet, fired to the top of the Defendant's head, to have gone through her head and then down into the bed pillow if the Defendant were standing or sitting on the side of the bed with the gun pointed in the direction of the victim and the pillow. Agent Scott stated that he compared the bullet taken from the victim's head with a test bullet fired from the gun possessed by the Defendant. He testified that when he looked at the two bullets under a comparison microscope, he "found some similar characteristics present on [the bullet taken from the victim's head] and present on [his] . . . test bullet . . ." However, Agent Scott told the jury that the similarities "were just not quite enough for [him] to be able to form an opinion to say conclusively" that the bullet from the victim's head was fired from the .38 caliber pistol recovered at the crime scene.

Agent Scott further testified that from his examination of the bullets and his testing of the gun's chamber rotation, he was able to determine that the first shot fired was the shot to the victim's head. He explained that the gun in question was a Smith and Wesson revolver, and that in such guns, "when the cylinder rotates during the firing process, it rotates in a counter-clockwise direction." He numbered the chambers of the gun, one through five, and discovered that the bullets in the number one and the number five position contained fired cartridge cases. The bullets in numbers two, three and four were not fired. The number one position contained a fired Remington cartridge case, which was consistent with the bullet recovered from the pillow. The number five position contained a fired Winchester cartridge case, which was consistent with the bullet taken from the victim's body. Agent Scott explained that "in it's [sic] original condition, number five was actually in the location of number two. When the hammer was pulled it [number five] rotated to the firing position and fired. The next shot was actually number one, which originally was in [sic] position of number three and rotated twice into the firing position so that it fired as the second shot." Agent Scott concluded that the bullet taken from the victim's head was in the number five position and was the first fired cartridge.

On cross-examination, Agent Scott testified that blood samples were also found in the bathroom on a rug and on a bathroom scale. He stated that a serology report showed that the victim's blood type was "EAP" which is a B blood type. He further explained that the serology report indicated that the blood samples taken from the bathroom were also type B. Agent Scott testified that they also performed testing on a cutting from the fitted sheet and the pillow case, on which the victim was lying. The blood tests revealed that the blood on the fitted sheet and the left pillow case cutting were type BA. On redirect, Agent Scott stated that the samples deposited in the bathroom could have dropped from the hands of the person who fired the shot, or could have been from a previous shaving incident.

The State rested its case-in-chief.

5

Patricia Duffield, the Defendant's mother, testified that, upon hearing that the Defendant had been shot, she and her husband went to Vanderbilt Hospital to see the Defendant. She stated that the Defendant was at Vanderbilt for approximately one week, and then was moved to Stalworth Rehabilitative Facility, where she stayed for about six weeks. After leaving Stalworth, the Defendant resided with Mrs. Duffield and her husband. Mrs. Duffield testified that, on the day before the shooting, she and her husband helped the Defendant move her things out of the house she shared with the victim into a storage facility. She noticed that the victim was very angry while they were moving, but she did not know why. After they had finished unloading at the storage facility, Mrs. Duffield rode with the victim and the Defendant back to the Duffield home. Mrs. Duffield went into the shop to put away some extra boxes, while Mr. Duffield, the Defendant and the victim were outside talking. At some point, she heard Mr. Duffield tell the Defendant and the victim good-bye, as they left to go back to their house in McEwen. Mrs. Duffield testified that it was her understanding that the Defendant was going to get some clothes, but would return to the Duffield home so that she could go to work the next morning (the Defendant worked with Mrs. Duffield).

Later, Mrs. Duffield spoke with the Defendant by phone to see how she was doing. The Defendant told Mrs. Duffield that the victim had defended her against his friends. The Defendant explained that the victim had told his friends "that just because that [sic] I wasn't going to be here, it wasn't going to be a swinging door for them to come through all the time." Mrs. Duffield spoke to the Defendant a second time, at approximately 9:00 p.m., and the Defendant said, "So far so good. They're fixing to leave." Mrs. Duffield testified that she could hear people talking in the background, including the victim. The Defendant told Mrs. Duffield, "Everything is going to be okay. It's all right, right now." The conversation ended with Mrs. Duffield telling the Defendant to call her, if the Defendant needed her.

Mrs. Duffield further testified that, when she first saw the Defendant at the hospital, the Defendant had a bandage on her head. She also noticed that the Defendant had bruises on the inner parts of her arms. On cross-examination, Mrs. Duffield admitted that she did not know if the Defendant had received the bruises on her arms while being transported from the Leming House to Vanderbilt Hospital. She testified that she was aware that her husband had a gun, but she did not know that the Defendant had taken the gun.

Yolanda Brown, the Defendant's aunt, testified that she saw the Defendant at Vanderbilt Hospital the day after she was brought to the hospital. She noticed that the Defendant's face was swollen and pale, and that she was badly injured. She observed dark bruises on the Defendant's arms. The Defendant's head was also bandaged.

Sue Talley, the Defendant's cousin, also saw the Defendant the day after she was taken to Vanderbilt Hospital. She stated that the Defendant's face was swollen and she had much blood under her nails. She further noticed that the Defendant had a bandage on her head and that part of the Defendant's head had been shaved. Talley also noticed that the Defendant had bruises on one of her arms, and the bruises were large and dark. On cross-examination, Talley stated that she did

6

not know if the Defendant obtained the bruises during her transport to the hospital, or if the bruises were there, when the Defendant and the victim were found.

The Defendant testified that she was right-handed and had no memory of the events surrounding the death of the victim or her own injuries. She stated that she did have memory of her family.

## ANALYSIS

## I. COMPETENCE TO STAND TRIAL

The Defendant argues that the trial court improperly ruled that she was competent to stand trial, given that it was undisputed that she suffered from amnesia. The State argues that because this issue was previously decided in the first appeal, the law of the case doctrine should make this Court's previous reasoning binding in the present appeal.

The law of the case doctrine proscribes appellate review of an issue that was decided in a previous appeal of the same case. State v. Jefferson, 31 S.W.3d 558, 560 (Tenn. 2000)(quoting Memphis Publg. Co. v. Tennessee Petroleum Underground Storage Tank Bd., 975 S.W.2d 303 (Tenn. 1998)). Under this doctrine,

> an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication.
>
> * * *
>
> The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

Id. at 560-61(quoting Memphis Publ. Co., 975 S.W.2d at 306). However, an appellate court may reconsider a previously decided issue under the following exceptions:

> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding;

7

(2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or

(3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

Id.

In the case sub judice, the Defendant raised this exact issue in her first appeal and another panel of this Court affirmed the trial court's ruling that the Defendant was competent to stand trial, despite her amnesia. For this reason, the law of the case doctrine is clearly applicable to the Defendant's case and should prevent review of this issue, unless one of the aforementioned exceptions applies to this case. We find that the first and third exceptions are clearly inapplicable; therefore, our analysis is limited to an examination of exception two -- whether the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand.

First, we must determine whether this Court's previous ruling was "clearly erroneous." We conclude that the prior ruling was not clearly erroneous. In the Defendant's first appeal, this Court began its analysis with the premise that "amnesia, in and of itself, does not constitute incompetency to stand trial." See Leming, 3 S.W.3d at 16 (citing State v. Dempsey Ray, No. 86-290-III, Davidson County, 1988 WL 18350 (Tenn. Crim. App. Mar. 2, 1988)). However, this Court further concluded that, in order to insure that a defendant suffering from amnesia is not deprived her right to a fair trial, we must engage in a two-part inquiry. Id.

First, there must be an analysis under Dusky as to whether the defendant has sufficient ability to consult with her attorney with a reasonable degree of rational understanding and whether the defendant understands the proceedings against her. See Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 789 (1960). Second, there must be an analysis of whether the defendant can receive a fair trial despite the amnesia, considering such factors as whether the crime and the defendant's whereabouts can be reconstructed without the defendant's testimony and whether access to government files would assist the defendant in preparing a defense. See United States v. Swanson, 572 F.2d 523, 527 (5th Cir. 1978) (cited in Ray, slip op. at 7).

Leming, 3 S.W.3d 7 at 16. We found that, because the Defendant was able to understand the charges against her and to discuss potential defenses and other aspects of her case with her lawyer and family, the first inquiry was satisfied. Id. We further held that the second inquiry was satisfied, given the State's ability to reconstruct the crime and the whereabouts of the Defendant through physical evidence and witness testimony. Id. We conclude that this Court's previous ruling was not clearly erroneous, and we need not determine whether a manifest injustice would result from allowing this prior ruling to stand.

We find that the law of the case doctrine prevents further appellate review of this issue, and therefore, the Defendant is not entitled to relief on this issue.

8

## II. SUFFICIENCY OF THE EVIDENCE

The Defendant asserts that the circumstantial evidence presented against her was insufficient to convict her of premeditated first degree murder. We note that this issue was also raised in the prior appeal and this Court found that the evidence was sufficient to convict the Defendant of first degree murder. Likewise, we find that the evidence in this appeal, which is substantially the same as before, is sufficient to support the conviction for premeditated first degree murder.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Keough, 18 S.W.3d 175, 180-81 (Tenn. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Keough, 18 S.W.3d at 181 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In contrast, the State on appeal is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences that may be drawn from the evidence. See State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Bland, 958 S.W.2d at 659.

Viewing the facts in a light most favorable to the State, the evidence at trial indicated that the victim and the Defendant were in the process of separating. The day before the shooting, the Defendant took a .38 caliber pistol from her father, who questioned her as to why she was taking the gun. The Defendant's father attempted to persuade her to stay at his house, but the Defendant refused. The next day, Officer Toungette found the victim and the Defendant lying in their bed, with the victim dead and the Defendant seriously wounded. Dr. Harlan testified that the bullet recovered from the victim's head was a .38 caliber bullet. Cathy Throgmorton and Sandra Buck testified that, on prior occasions, the Defendant had stated that she would kill the victim before she would allow him to leave or divorce her. Based upon this circumstantial evidence, the jury found the Defendant guilty of premeditated first degree murder. This conclusion was supported by the evidence beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

## III. ADMISSION OF STATEMENTS MADE BY THE DEFENDANT

9

In her next issue, the Defendant challenges the trial court's admission of testimony from Sandra Buck and Cathy Throgmorton. The Defendant argues that these two witnesses should not have been permitted to testify that she said she would kill the victim before she would let him leave her. Specifically, Defendant contends that the testimony of these witnesses was not relevant to the shooting, because the statements were made well before the shooting. The State argues that this testimony was properly admitted to show the continuing condition of the Defendant's state of mind and to support the state's theory that the Defendant continued in this state of mind until the time of the murder.

> Tennessee Rule of Evidence 402 provides that
> All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible.

Rule of Evidence 401 states that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A trial court generally has broad discretion in determining the admissibility of evidence, and absent an abuse of that discretion, a trial court's decision will not be reversed. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999).

Here, the trial court admitted testimony from Cathy Throgmorton and Sandra Buck concerning statements made by the Defendant. These two witnesses testified that the Defendant told them, at differing points, that she would kill the victim before she would allow him to leave her. The trial court found that Sandra Buck's testimony relating to statements made by the Defendant over a year before the shooting, was too remote and irrelevant by itself. However, the trial court found that Throgmorton's testimony concerning statements made two years before the murder and again six months before the murder, was sufficient to show a continuing condition or a continuous state of mind possessed by the Defendant.

We find that the trial court did not abuse its discretion in admitting this evidence. The testimonies of Buck and Throgmorton were directly relevant to show premeditation on the part of the Defendant, and not so remote as to preclude admission. Moreover, the remoteness of these statements affected only the weight of the testimony, and not the admissibility of the testimony. State v. Ruane, 912 S.W.2d 766, 778-79 (Tenn. Crim. App. 1995). Therefore, the Defendant is not entitled to relief on this issue.

## IV. EXCLUSION OF TESTIMONY REGARDING STATEMENTS MADE BY THE DEFENDANT CONCERNING HER NEED FOR A WEAPON

The Defendant challenges the trial court's exclusion of out-of-court statements she made to her sister regarding her need for a weapon and protection. During a jury-out hearing, the Defendant offered to present testimony from her sister, Kimberly Simmons, that two months before the murder, the Defendant told her sister that she needed a gun to protect herself from the victim's friends. The

trial court ruled that testimony from Defendant's sister would be superfluous, since the Defendant's father had previously been allowed to testify to similar statements made by the Defendant the day before the murder. On appeal, the Defendant argues that the additional testimony from her sister, like the testimony of Throgmorton and Buck, was relevant to show her continuous state of mind and fear for her safety. The State responds that there was no need to show a continuous state of mind, when the Defendant's father testified to a statement made the day before the shooting, which was direct evidence of the Defendant's then existing state of mind within close proximity to the murder. Thus, the State argues that the testimony of Kimberly Simmons would have been unnecessary and cumulative, and therefore inadmissible under Rule 403 of the Tennessee Rules of Evidence.

The Defendant contends that this evidence is admissible under Rule 803(3) of the Tennessee Rules of Evidence. Subsection (3) of Rule 803 provides the so-called "state of mind" exception to the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Rule 403 of the Tennessee Rules of Evidence states that relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or *needless presentation of cumulative evidence*." In the instant case, the trial court excluded testimony from Kimberly Simmons, finding that the testimony was superfluous. A trial court's ruling on the admissibility of evidence will not be reversed unless the court abused its discretion in admitting or excluding the challenged evidence. State v. Bigbee, 885 S.W.2d 797, 806 (Tenn. 1994).

We do not believe the trial court abused its discretion in excluding the testimony of Defendant's sister. The trial court had already permitted the testimony of Defendant's father, Chester Duffield, regarding statements made by the Defendant the day before the murder. Duffield's testimony was relevant to Defendant's then existing state of mind, because the Defendant had obtained possession of the murder weapon at that very time. However, Simmons' testimony regarding similar statements made by the Defendant two months prior, was less probative on the issue of fear, as the Defendant was not in possession of a gun at that time. Thus, the additional testimony could properly have been deemed cumulative. The Defendant is not entitled to relief on this issue.

## V. DENIAL OF DEFENDANT'S REQUEST FOR A MISTRIAL

The Defendant's appeal also challenges the trial court's denial of her request for a mistrial. At trial, the Defendant requested a mistrial because the trial court denied her request for a special jury instruction. The Defendant asserted the special jury instruction was necessary, based upon the following comments made by the State during voir dire:

General Alsobrooks:   The fact that this is a homicide trial and that everybody in here will know, at some point in time, that the punishment in this case is not going to be the death penalty, it's not going to be life without parole, it will be life.  Does that in anyway cause you concern in terms of your ability to be able to follow the instructions of the Court?

We note that, at the time this statement was made, the Defendant made no objection. Furthermore, at the close of all the proof, the trial court heard arguments from both counsel regarding a special jury instruction on the issue of parole eligibility.  At that time, counsel for the Defendant made the following statement:

Mr. Barrett:   I would also state for the record, that at the time the comment was made, I did make an immediate notation of that and I think it was clear if I had objected at that time in *Voir Dire* in front of the jury, then I think it clearly would have magnified the problem.

Defense counsel argued that the prosecutor's statement may have misinformed the jury and caused some jurors to speculate as to the number of years Defendant was required to serve, before being eligible for parole. The Defendant requested that the trial court instruct the jury that a Defendant convicted of first degree murder is not eligible for parole consideration, until after such Defendant has served fifty-one calendar years.  On appeal, the Defendant contends that, if the trial court had granted her request for a special instruction, then possibly the jury would not have convicted her of first degree murder, but of some lesser included offense.  The State asserts that the trial court properly declined to give a special instruction on parole eligibility, given that the jury was not misinformed, but merely uninformed.  The State further claims that since the trial court instructed the jury that they were only to consider the Defendant's guilt or innocence, the jury could not have considered the Defendant's parole eligibility.

The decision of whether to grant a mistrial is within the sound discretion of the trial court, and we will not disturb the trial court's action on appeal absent an abuse of that discretion.  State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).  Generally, a mistrial will only be declared "if there is a 'manifest necessity" requiring such action by the trial judge."  Id. (quoting

12

Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "If it appears that some matter has occurred which would prevent an impartial verdict from being reached, a mistrial may be declared." Arnold, 563 S.W.2d at 794.

We find that there was no "manifest necessity" for a mistrial in the present case. Every accused has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The trial judge is obligated, without request, to give proper jury instructions that are "fundamental in nature, [and] essential to a fair trial." Id. at 249. A trial court is not required to give special instructions when jury instructions are full, fair, and accurate statements of the law. State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997). Moreover, a defendant does not have a right to have redundant or irrelevant instructions charged to the jury. State v. Bryant, 654 S.W.2d 389, 390 (Tenn. 1983). We must review the entire charge and invalidate it only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

Here, the trial judge properly instructed the jury. The jury received instructions that the trial court would instruct them on the relevant law. A jury is presumed to have followed the trial court's instruction. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). In order to overcome the presumption that the jury followed the trial court's instruction, the defendant must show by clear and convincing evidence that the instruction was not followed. State v. Newsome, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987). From the record, it is clear that defense counsel thought it in the best interest of his client not to object to the prosecutor's statement, and thereby draw more attention to the statement. Rather, defense counsel made a tactical decision to wait until a later point to request a special or curative jury instruction, which the trial court ultimately declined to give. "When a defendant makes a considered and deliberate choice to waive a proper objection in an effort to gain tactical advantage, he or she will not later be heard to complain that the trial court's failure to provide a limiting instruction 'substantially prejudiced' his or her rights." See State v. Smith, 24 S.W.3d 274, 284 (Tenn. 2000). The trial court did not err by declining to give the special injury instruction requested by the Defendant. The trial court did not err in declining to grant Defendant's motion for a mistrial.

## CONCLUSION

After reviewing the briefs, the record, and the applicable law, we find no reversible error. Accordingly, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE

13