United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 28, 2005**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 04-30486
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TITUS CLAY,

Defendant-Appellant.

Appeal from the United States District Court
For the Western District of Louisiana

Before KING, Chief Judge, and GARZA and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Louisiana parolee Titus Clay absconded from supervision in 2002. After obtaining a warrant

for Clay's arrest, Probation and Parole Officer Randy Rabb received a tip that Clay was at the St.

Charles Apartments in Bossier City, Louisiana. When Rabb and a team of officers from the Louisiana

Department of Probation and Parole arrived at the apartment, Donald Stevens answered the door and

informed the officers that Clay was in the apartment. The officers found Clay asleep in a bedroom

at the back of the apartment, awakened him, and placed him under arrest. After permitting him to

dress, the officers escorted Clay into the apartment's living room. In a second bedroom in the apartment, officers discovered another parolee under Rabb's supervision, Deveonse Atkins. In Clay's room, the officers discovered marijuana and two handguns, one in the bed sheets of the bunk above Clay's bed and another on a shelf in the bedroom closet. In Atkins' bedroom, officers discovered a pistol in a dresser drawer, a toolbox with ammunition on the floor, $1342 in cash, Atkins' identification, marijuana, scales, and plastic baggies.

Based on the firearms discovered during the officers' search of the apartment, Clay and Atkins were each indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).[1] The men were tried jointly, and the jury returned a verdict of guilty as to Clay and not guilty as to Atkins. The court sentenced Clay to 78 months imprisonment. Clay filed this appeal, claiming that the district court erred in: (1) denying his motion to suppress the firearms that formed the basis for his prosecution; (2) denying multiple motions to sever Clay's and Atkins' trials;[2] and (3) admitting into evidence a questionnaire Clay signed while in detention.

---

[1] The original indictment included other charges that were later severed and that are not at issue in this appeal.

[2] In his statement of issues, Clay lists, in addition to his claim that the district court erred in denying his motion to sever in light of the photographs, claims that the district court erred in admitting the photographs and in permitting the Government to question a witness about the photographs. Clay fails, however, to brief these issues in the body of his brief. While the brief purports to consolidate argument of these issues with the severance issue, it in fact discusses only whether the district court erred in denying the defendant's severance motions. The brief makes passing reference to Clay's trial objections to admission of the photographs and questioning regarding them, but states that "[w]e raise our objections to the questioning of the witnesses about the photographs as issues in order to bolster our argument that the severance should have been granted and that it was an abuse of discretion for the District Court not to grant the severance." Given Clay's failure to pursue his separate evidentiary claims, we find that he has waived these grounds of appeal. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

I

Clay argues that the district court erred in refusing his motion to suppress the guns that formed the basis for his federal conviction. He contends that weapons should have been suppressed because the officers who arrested him were not justified in conducting the search that uncovered them. In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its legal conclusion *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) (holding that "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal").

After arresting Clay, the officers escorted him into the living room. Because Clay was still barefoot, Officer Sherry Cone asked where his shoes were located. Clay indicated that they were in the bedroom, and Officer Cone returned to the bedroom to retrieve them. In the bedroom, Cone noticed a bag of marijuana sitting in an unfilled aquarium on the table near the bed where Clay was found.[3] Cone also noticed three photographs. Two of the photographs showed a person Cone erroneously identified as Atkins holding a gun.[4] In light of these discoveries, the officers searched the bedrooms in which Clay and Atkins were found, thereby discovering the firearms that formed the basis for the federal charges against each. The Government argues, and we agree, that Cone's discovery of the marijuana and pictures in the bedside aquarium was adequate to provide the

---

[3] Officers Rabb and Shaver had also returned to the bedroom to discuss what to do about their discovery of Atkins in the apartment. Neither Rabb nor Shaver had noticed the contents of the aquarium.

[4] As conditions of their probation, both Clay and Atkins were prohibited from possessing firearms.

reasonable suspicion of criminal activity necessary to justify the officers' subsequent search.[5]  *See U.S. v. Keith*, 375 F.3d 346, 349 (5th Cir. 2004) (stating that "warrantless non-consensual searches of a probationer's residence on the basis of less than probable cause," are permissible under the Fourth Amendment, provided the searches are based on reasonable suspicion).

This holding does not end our inquiry, however.  Clay contends that the guns discovered in the officers' search should nevertheless be suppressed because Cone observed the items in the aquarium only after *unlawfully* reentering the bedroom.[6]  Specifically, Clay argues that "once the [arrest] warrant was executed and Clay was taken into custody, then at that point the officers should have left the apartment with him in custody.  It was unreasonable for the officers to return to the bedroom where he was sleeping, after he had been removed from the bedroom, and it was unreasonable for [Cone] to come into the bedroom and search the empty aquarium . . . ."  The district court disposed of Clay's argument when it adopted the magistrate judge's conclusion that Officer Cone's return to the bedroom was permissible because it took place "in the course of [the] arrest."

---

[5] We reject Clay's suggestion that Cone must have been "snooping" in order to discover the marijuana because none of the officers previously in the room had noticed it.  The marijuana and pictures, sitting in a clear co ntainer on a bedside table, were in plain view. *See United States v. Jackson*, 700 F.2d 181, 189 (5th Cir. 1993) (citing *Harris v. United States*, 390 U.S. 234, 236 (1968) ("Once the officers are legally inside the lodging, any evidence or contraband that is in plain view is subject to seizure and may be admitted into evidence."); *United States v. Munoz*, 150 F.3d 401, 411 (5th Cir. 1998) ("An object falls within plain view if law enforcement officers are lawfully in a position from which they view it, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to it.").

The Government has not argued, and we do not address, whether Clay's absconding from parole and association with another felon, Atkins, were in themselves sufficient to give rise to reasonable suspicion justifying a search of the apartment.

[6] As in the memorandum submitted to the magistrate judge, Clay's brief on appeal cites no case law supporting his contention that the circumstances of the weapons' discovery renders them inadmissible and spends little time explaining his claim.

We hold that Officer Cone's reentry into the bedroom was justified, though on a basis different from that of the district court.[7]

In considering Fourth Amendment claims, both this court and other circuit courts routinely distinguish between the arrest itself and subsequent procurement of clothing for the arrestee, requiring independent justification for entry or reentry into a room or dwelling after the arrest itself has been completed. *See United States v. Wilson,* 306 F.3d 231, 240-41 (5th Cir. 2002), *overruled on other grounds* by *United States v. Gould*, 364 F.3d 578, 586 (5th Cir. 2004) (en banc), (holding that, in light of the hazards associated with public streets and sidewalks, the need to provide clothes and shoes for a man arrested outside his apartment constituted exigent circumstances justifying police entry into the apartment for that purpose); s*ee also United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir. 2000) (holding that "an officer is authorized to take reasonable steps to address the safety of the arrestee and that the arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant"); *United States v. Di Steffano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (holding that arresting officers had a duty to find clothing for an arrestee dressed only in a nightgown and bathrobe, and that an officer's entry into the arrestee's bedroom for that purpose, after making arrest in the living room, was justified).

Given the diminished privacy expectations of parolees, it is not clear whether *Wilson's* exigent circumstances requirement for retrieval of clothing applies in the context of a parolee arrest, and the parties do not address the issue. *See United States v. Scott*, 678 F.2d 32, 34 (5th Cir. 1982) ("The

---

[7] We may affirm the district court's judgment on any basis supported by the record. *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998); *United States v. Grosz*, 76 F.3d 1318, 1324 (5th Cir. 1996).

parolee occupies a position intermediate between that of an ordinary citizen, entitled to be free of intrusion not based on probable cause at least, and that of an incarcerated convictee, liable to searches at any time for well-nigh any reason."); *United States v. Kincade*, 379 F.3d 813, 834 (9th Cir. 2004) (stating that "the Supreme Court . . . often has noted that conditional releasees enjoy severely constricted expectations of privacy relative to the general citizenry ) ) and that the government has a far more substantial interest in invading their privacy than it does in interfering with the liberty of law-abiding citizens"). Assuming, without deciding, that *Wilson's* exigent circumstances requirement does apply in the context of a parolee arrest, we hold that the need to procure footwear for Clay constituted exigent circumstances justifying Officer Cone's return to the bedroom. *See Wilson,* 306 F.3d at 241 ("[T]he potential of a personal safety hazard to the arrestee places a duty on law enforcement officers to obtain appropriate clothing. For that reason, we hold that exigent circumstances existed for the officers to enter [the] apartment . . . ."). Having lawfully obtained her vantage point, Officer Cone's observation of the marijuana in the bedside aquarium in turn provided reasonable suspicion of criminal activity justifying the officers' search of the apartment bedrooms. *See Keith*, 375 F.3d at 349. Accordingly, the district court's denial of Clay's suppression motion did not violate Clay's rights under the Fourth Amendment.

II

Clay next argues that the district court erred in denying his multiple motions to sever his trial from that of Atkins. Specifically, Clay contends that he was prejudiced by Atkins' defense, which resulted in the admission of photographs the district court had previously ruled inadmissible in the Government's case-in-chief. "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the

defendants' trials, or provide any other relief that justice requires." FED R. CRIM. P. 14(a). We review a denial of a motion to sever for abuse of discretion. *U.S. v. Peterson*, 244 F.3d 385, 393 (5th Cir. 2001). "[J]oint defendants face a heavy burden in demonstrating to a district court that antagonistic defenses warrant granting a severance motion. The burden is correspondingly heavier when, on appeal, they seek to demonstrate that the district court abused its discretion by declining to do so." *U.S. v. Daniels*, 281 F.3d 168, 177 (5th Cir. 2002).

Three pictures were found in Clay's bedroom at the time of his arrest. Two of the photographs were undated and showed two people holding handguns. The third photograph was dated and showed a man holding a beer bottle. At the scene of the arrest, Officer Cone identified the man in the two undated photographs as Atkins. Testimony at trial indicated, and the parties do not dispute, that the photographs are in fact of Clay. Before trial, Clay argued that the photographs depicting him holding a gun should not be admitted into evidence because the danger of prejudice outweighed the photographs' probative value. The district court held that the dated photograph was admissible, but that the two undated photographs could not be submitted into evidence by the Government.

Clay moved to sever, arguing that Atkins was going to use the photographs the court had ruled inadmissible and that he would thereby be prejudiced because the photographs depicted Clay holding guns.[8] Noting that the guns depicted in the photographs were not the guns found in the apartment, and that Clay claimed he could established that the photographs had been taken nine years previously, the court denied the severance motion because it found no danger of prejudice.

_____

[8] Atkins' attorney had previously indicated that he intended to question witnesses about the photographs and the identity of the person in the photographs))presumably to establish that it was not Atkins in the photographs.

-7-

The jury first learned of the photographs' existence when Rabb testified on cross-examination by Atkins' attorney that, while the officers were at the apartment, officer Cone showed him a picture of an individual she believed to be Atkins holding a firearm. Rabb acknowledged that the person in the picture was not Atkins, but did not identify the person in the picture. On redirect by the Government, Rabb testified that the pictures were found in Clay's bedroom, but again did not identify the person in the picture. Officer Shaver similarly testified on cross-examination by Atkins' attorney that Cone had shown him a photograph of a person she identified as Atkins holding a weapon. Officer Cone then testified regarding the dated photograph, which the court had previously ruled admissible. She identified the person in the photograph as Clay. On cross-examination by Atkins' attorney, Cone testified that there were a total of three photographs in the aquarium and that she had, in a report, characterized the photographs as picturing Atkins holding a firearm. On redirect, Cone conceded that she now understood that the person in the photographs might not be Atkins. Clay's attorney reiterated his client's motion to sever, which the court denied. To this point, no one had identified Clay as the person in the two undated photographs and the photographs had not been introduced into evidence.

Clay's counsel then called Langvesha Walker, Clay's girlfriend, to testify. Asked whether she had seen Clay with a gun in his possession "during this time period that you were seeing him," Walker responded that she had not. Arguing that this question "opened the door," the Government then sought to cross-examine Walker regarding the two undated photographs. After a colloquy outside the hearing of the jury, the court permitted the Government to ask Walker whether she could identify anyone in the photographs. Counsel and the court apparently hoped that Walker would respond with a "yes" or "no" answer. Instead, she responded "Titus," referring to Clay. Without additional

objection from Clay's counsel, the Government then asked whether she had seen the pictures before and whether she recognized anyone else in the pictures. Walker responded in the negative to both questions.

Later in the trial, Clay testified that the two undated photographs had been taken between seven to nine years before trial, prior to his felony conviction. Clay also identified the guns in the photographs as revolvers, rather than semiautomatic weapons like the ones found in the room where he was arrested.[9] The prosecution introduced no evidence rebutting this testimony.

We find that the district court did not abuse its discretion in denying Clay's motions to sever because severance was not necessary to prevent compelling prejudice. *See United States v. Sudderth*, 681 F.2d 990, 996 (5th Cir. 1982) ("In order to demonstrate an abuse of discretion, a defendant must show that the denial of a severance caused him to suffer 'compelling prejudice.' A showing of only some prejudice is insufficient."). Clay's brief on appeal does not explain what prejudice Clay suffered as a result of the photographs' admission. Presumably, he relies on the district court's pretrial determination that the two undated photographs could not be admitted by the Government because they were more prejudicial than probative. But, as the district court acknowledged, the guns shown in the two photographs at issue are not the same guns that formed the basis for Clay's conviction. Moreover, Clay's uncontradicted testimony at trial was that the photographs were taken when he was a teenager, years before he was placed on probation.[10] More importantly, any prejudice to Clay as a result of the photographs could have been adequately cured by an instruction to the jury limiting

---

[9] Clay also explained that he was in possession of the photographs at the time of his arrest because a high school friend had recently returned the photographs to him.

[10] Comparison of Clay's appearance in the two undated photographs to the third photograph introduced at trial demonstrates that the two undated photographs were not of recent vintage.

the purposes for which the photographs could be considered. The failure of Clay's attorney to request such an instruction does not render the district court's denial of Clay's motion to sever reversible error. *See United States v. DeSimone*, 660 F.2d 532, 539 (5th Cir. 1981) (holding that a motion to sever should be granted only if the defendant can demonstrate compelling prejudice that cannot by alleviated by the trial court and as a result of which he was not able to obtain a fair trial).

III

Finally, Clay argues that the district court erred in refusing to suppress a parole revocation form in which Clay arguably admitted to possession of a firearm. Clay contends that the document should not have been admitted because the officer who presented the form to him failed to advise him of his *Miranda* rights. We review the district court's findings of fact for clear error, and the ultimate issue of voluntariness, a question of law, *de novo*. *United States v. Scurlock*, 52 F.3d 531, 536 (5th Cir. 1995). "When a defendant challenges the voluntariness of a confession, the government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial." *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). The admission of an involuntary confession is subject to a harmless error analysis. *Id*. "The harmless error standard requires that a court be able to declare that the constitutional error was harmless beyond a reasonable doubt." *Null v. Wainwright*, 508 F.2d 340, 343 (5th Cir. 1975) (citing *Chapman v. California*, 386 U.S. 18 (1967)).

Two days after Clay's arrest, Rabb met with Clay to inform him of his rights as a parolee, including his right to a preliminary hearing, his right to defer the preliminary hearing, and his option

-10-

to waive a hearing and plead guilty to violating his parole. Rabb did not advise Clay of his *Miranda* rights at the time of the interview, but officers had informed Clay of his *Miranda* rights at the time of his arrest. Rabb presented to Clay a "Bill of Particulars" form which alleged that Clay had violated his parole by: (1) failing to report; (2) possessing a firearm; (3) failing to notify the probation department of his change of address; and (4) failing to pay his supervision fee. The Bill of Particulars is marked with an "x" next to the statement "I do not want a Preliminary Hearing and *plead guilty to all violations*." (emphasis added). The form is also marked with another "x" next to a section captioned "WAIVER OF FINAL PAROLE REVOCATION HEARING." The section states

> I admit that I am in violation of the conditions of my parole in the manner outlined by my Parole Agent in the Notice of Preliminary Hearing. In signing this waiver, I fully understand that I waive my rights and privileges to a final parole violation hearing before the Board of Parole, and that the Board, in all probability, will REVOKE my parole . . . .

Clay's signature appears at the end of the page.

Clay's apparent admission in the Bill of Particulars to firearms possession was contradicted by his responses to a "Parole Revocation Questionnaire" Rabb presented to Clay during the same interview. There, Clay marked "No" in response to the question "Do you understand the parole violation charges against you?". At trial, Rabb testified that Clay explained that he checked "No" on the questionnaire because he did not understand how he could be charged with possession of firearms that did not belong to him. Asked whether Clay "told him at that point that the guns were not his," Rabb responded "[t]hat's correct, sir." Notwithstanding Clay's statements to Rabb indicating that the guns were not his, the Government introduced the Bill of Particulars form into evidence, apparently as evidence that Clay had confessed to possessing the guns found in his room.

-11-

Clay argues that Officer Rabb's failure to advise him of his *Miranda* rights before he filled out the Bill of Particulars renders the form inadmissible. Clay fails to explain, however, why the *Miranda* warning officers gave him two days earlier, at the time of his arrest, was no longer effective. While the passage of time between a defendant's receipt of his *Miranda* rights and his confession may be a factor in determining the voluntariness of the confession, the passage of time is not itself necessarily sufficient to render *Miranda* warnings ineffective. *See Evans v. McCotter*, 790 F.2d 1232, 1237-38 (5th Cir. 1986) (rejecting argument that the passage of hours after defendant was given *Miranda* warnings rendered defendant's statements involuntary); *Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir. 1975) (finding statements made approximately two weeks after defendant was advised of *Miranda* rights were voluntary where defendant indicated she remembered her rights); *Mitchell v. Gibson*, 262 F.3d 1036, 1057-58 (10th Cir. 2001) (noting that "[n]umerous courts have rejected the argument that the passage of time alone invalidates previously given *Miranda* warnings" and citing cases). Because Clay received a *Miranda* warning at the time of his arrest,[11] and because nothing in the record suggests that Clay either no longer understood those warnings or did not appreciate their applicability to Rabb's questioning, we find that the district court did not err in refusing Clay's motion to suppress the Parole Revocation Questionnaire. *See United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (holding statements the defendant made to his parole officer the day after the defendant received a *Miranda* warning to be admissible); *Maguire v. United States*, 396 F.2d 327, 331 (9th Cir. 1968) (holding *Miranda* warning given three days prior to interrogation by a different officer sufficient to inform defendant of his *Miranda* rights).

---

[11] Clay has not contested the validity of the *Miranda* warning he received at the time of his arrest.

For these reasons, we AFFIRM the judgment of the district court.