MAXWELL, J.,
 

 for the Court:
 

 ¶ 1. A Clarke County jury found Riley Lafate Adams guilty of murdering Ruth Ellen Roberts. On appeal, Adams claims: (1) the circuit court should have excluded his final admission to law enforcement that he shot Roberts; (2) it erred in excluding his testimony concerning prior suicide attempts, which he deemed relevant to his theory of defense-that while attempting to kill himself, his pistol discharged when Roberts attempted to wrestle the gun away from him; and (3) the circuit judge improperly refused his proposed “diminished capacity” instruction.
 

 ¶ 2. Since Adams had been advised of his
 
 Miranda
 
 rights at least three times, and at no point indicated a misunderstanding of those rights, we find no error in the admission of his subsequent incriminating statements. We also find Adams’s pro
 
 *435
 
 posed testimony about his prior suicide attempts was too vague to support the admission of the alleged attempts. Further, because Adams’s proposed jury instruction incorrectly suggested voluntary intoxication could negate deliberate design to commit murder, the circuit court properly refused it. Finding no merit to Adams’s remaining arguments, we affirm.
 

 FACTS
 

 ¶ 3. Roberts died of a single gunshot wound to her neck from a .22-caliber pistol. The shooting occurred on April 2, 2008, at Adams’s Shubuta, Mississippi, residence. Roberts had been Adams’s “live-in-companion” since 1995.
 

 ¶ 4. When Deputy Bo Davis of the Clarke County Sheriffs Department arrived at Adams’s mobile home, he found Adams on the front porch talking on a cordless telephone.
 
 [1]
 
 Adams had blood on his shirt and hands. Adams told Deputy Davis that Roberts had shot herself.
 

 ¶ 5. Investigator Gary Kelly of the Clarke County Sheriffs Department also arrived and spoke to Adams. Investigator Kelly advised Adams of his
 
 Miranda
 
 rights, then spoke with him at the scene for almost an hour. Adams gave several conflicting versions of the events surrounding Roberts’s death.
 

 ¶ 6. He first claimed that after returning from fishing, he heard a gunshot and went to the back of the house, where he found Roberts dead, apparently from a self-inflicted gunshot wound. Adams then gave a slightly different version — that upon returning from fishing he found Roberts dead. In yet another account, Adams explained that “two black males” had killed Roberts. Investigator Kelly explained that when he pointed to the inconsistencies, Adams “would just go back and give ... a different story.” He recalled Adams providing at least five or more different versions, including one consistent with Adams’s trial testimony that while he was attempting to commit suicide, Roberts tried to wrestle away his gun, which accidentally discharged killing her. A .22-caliber revolver was found at the scene, containing five live rounds and one spent casing.
 

 ¶ 7. After agreeing to go to the sheriffs office for further questioning, Adams was again given
 
 Miranda
 
 warnings — this time in a written advice of rights form. Adams signed the form, agreeing to waive his rights, and was interviewed. Investigator Kelly maintained that after Adams acknowledged he understood his rights, he provided another oral statement. Adams was held in custody overnight, and the next day, April 3, he signed a typewritten statement depicting this most recent oral recitation. In this typewritten statement, Adams claimed that while he was attempting suicide in Roberts’s presence, Roberts grabbed at the gun, which accidentally discharged killing her.
 

 ¶ 8. That same day, Adams signed a second typewritten statement,
 
 [2]
 
 which memorialized a different version — that the shooting occurred following an argument with Roberts over Adams’s drinking habits. During this alleged argument, Adams claims to have confronted Roberts about her taking his prescription medication without his permission. Adams explained that after the argument, he retrieved his pistol from a cabinet and headed toward
 
 *436
 
 the back bedroom, where Roberts was lying in the bed. He then sat down on the bed. As he put it, “it was like [he] was hav[ing] a psychotic episode.” Adams admitted that he “cocked the 22 revolver and turn[ed] around and shot [Roberts] ... in the right side of her neck.”
 

 ¶ 9. On April 4, Adams requested to speak to Investigator Kelly again. This time, Adams’s account, which he provided in his own handwriting, was largely consistent with his most recent admission. According to Investigator Kelly, Adams had difficulty spelling, but he told Adams “to write [his] statement himself the best he could.” The April 4 statement reflects that Adams retrieved his gun, then got into an argument with Roberts about taking his pills. The statement then reads: “AFTER THAT I PULL THE TIGER [sic] I’WAS LIKE ME BUT AT TH[E] SAME IT [sic] WAS BODYLESS [sic].”
 

 ¶ 10. At trial, Adams testified in his own defense. He explained that when he returned from Ashing, he sat down for a while to do a “puzzle book.” He was suddenly overcome with suicidal feelings and “wanted to die.” He admitted retrieving the gun and going into the bedroom where Roberts was lying in the bed. He then claimed, “I got down and was asking God to forgive me for what I was fixing to do, and she grabbed the gun ... [and] it went off.”
 

 ¶ 11. His attorney attempted to question him about his past suicide attempts. The State objected on relevance grounds, and the circuit court sustained the objection and excluded the evidence.
 

 ¶ 12. Adams submitted jury instruction D-6, which directed the jury to consider whether he had “diminished capacity” and, if so, what effect it had on his ability to form deliberate design to commit murder. The circuit court denied the instruction.
 

 ¶ 18. The jury found Adams guilty of murder in violation of Mississippi Code Annotated section 97 — 3—19(l)(a) (Rev. 2006). The circuit court sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. Adams filed a motion for ju'dgment notwithstanding the verdict or a new trial, which the court denied.
 

 I.
 
 Miranda
 

 ¶ 14. Prior to trial, Adams moved to suppress all of his statements claiming he “may or may not have been properly [Mjirandized.”
 
 [3]
 
 After conducting a hearing on the motion, the circuit court found Adams knowingly waived his
 
 Miranda
 
 rights and denied Adams’s motion to suppress. On appeal, Adams argues his final statement to law enforcement, which he penned by hand on April 4, was involuntary because law enforcement did not renew previously given
 
 Miranda
 
 warnings.
 

 ¶ 15. During the suppression hearing, Investigator Kelly testified that he administered Adams’s
 
 Miranda
 
 warnings twice at the scene on April 2 at some point after 6:00 p.m. He advised Adams of his
 
 Miranda
 
 rights a third time that same day at the Clarke County Sheriffs Office at approximately 8:50 p.m., immediately prior to obtaining an oral statement from Adams. According to Investigator Kelly, Adams indicated that he understood his
 
 Miranda
 
 rights and signed a written waiver before providing his oral statement. This specific
 
 *437
 
 oral statement was reduced to writing and signed by Adams at approximately 2:00 p.m. on the following day, April 3.
 
 [4]
 

 ¶ 16. Investigator Kelly testified that Adams initiated each of the subsequent interviews. Before these later interviews, he reminded Adams of the previously given
 
 Miranda
 
 warnings. Though Investigator Kelly did not reissue complete warnings before each subsequent interview, Adams neither invoked his right to counsel nor expressed any questions or misunderstandings about his rights. At approximately 7:49 p.m. on April 8, Adams signed a second typewritten statement in which he confessed to shooting Roberts. The next day, on April 4, Investigator Kelly received a call at home advising him that Adams wished to provide yet another statement. Investigator Kelly returned to the sheriffs office and let Adams write out this particular statement in his own handwriting. This statement was similar to the previous one and suggested that he had shot Roberts. Adams testified at his suppression hearing that he could not recall ever being advised of his rights.
 

 ¶ 17. “Absent a knowing and intelligent waiver of rights, statements made by a suspect while under ‘custodial interrogation’ are inadmissible at trial where pri- or to making the statements, the suspect was not
 
 Miranda
 
 [v.
 
 Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ] warned.”
 
 Moore v. State,
 
 933 So.2d 910, 919 (¶ 30) (Miss.2006). The State has the burden to prove beyond a reasonable doubt that a confession was voluntary.
 
 Id.
 
 This “burden is met and prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward.”
 
 Id.
 

 ¶ 18. “[T]he voluntariness of a
 
 [Miranda
 
 ] waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances.”
 
 Thomas v. State,
 
 42 So.3d 528, 535 (¶24) (Miss.2010). Great deference is afforded to a trial judge’s determination that a confession is voluntary.
 
 White v. State,
 
 495 So.2d 1346, 1347 (Miss.1986). “Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal.”
 
 Bartolo v. State,
 
 32 So.3d 522, 527 (¶ 14) (Miss.Ct.App.2009).
 

 ¶ 19. A criminal defendant need not be “advised of his rights every time there is a brief pause in questioning.
 
 Miranda
 
 simply requires that if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.”
 
 Baldwin v. State,
 
 757 So.2d 227, 235 (¶ 31) (Miss.2000) (quotation marks omitted). “What
 
 Miranda
 
 apparently requires is cessation of interrogation when requested and if subsequently there is a reasonable basis for inferring that a suspect has voluntarily changed his mind, new and adequate warnings must be given.”
 
 McDougle v. State,
 
 355 So.2d 1386, 1388 (Miss.1978) (citing
 
 United States v. Collins,
 
 462 F.2d 792, 801-02 (2d Cir. 1972)).
 

 ¶ 20. Federal courts have likewise held that the mere passage of time does not invalidate
 
 Miranda
 
 warnings.
 
 United States v. Clay,
 
 408 F.3d 214, 221-22 (5th Cir.2005);
 
 Mitchell v. Gibson,
 
 262 F.3d
 
 *438
 
 1036, 1057 (10th Cir.2001);
 
 Stumes v. Solem,
 
 752 F.2d 317, 320-21 (8th Cir.1985);
 
 United States v. Weekley,
 
 130 F.3d 747, 751 (6th Cir.1997). “While the passage of time between a defendant’s receipt of his
 
 Miranda
 
 rights and his confession may be a factor in determining the voluntariness of the confession, the passage of time is not itself necessarily sufficient to render
 
 Miranda
 
 warnings ineffective.”
 
 Clay,
 
 408 F.3d at 221-22 (citing
 
 Evans v. McCotter,
 
 790 F.2d 1232, 1237-38 (5th Cir.1986)).
 

 ¶ 21. In
 
 Clay,
 
 the Fifth Circuit Court of Appeals found that a confession obtained two days after
 
 Miranda
 
 warnings were given was voluntary, and renewed warnings were not required.
 
 Clay,
 
 408 F.3d at 221-22. The defendant, Clay, a parolee, absconded from supervision.
 
 Id.
 
 at 216. Once apprehended, he was arrested for possession of a firearm by a convicted felon, and was later convicted.
 
 Id.
 
 At the time of his arrest, Clay was given
 
 Miranda
 
 warnings.
 
 Id.
 
 at 221. Two days later, when he met with a parole officer to discuss his rights as a parolee (e.g., the right to a preliminary hearing), Clay was not re-issued
 
 Miranda
 
 warnings.
 
 Id.
 
 During this meeting, Clay signed a form admitting he had possessed a firearm.
 
 Id.
 
 The Fifth Circuit explained that “[b]eeause Clay received a
 
 Miranda
 
 warning at the time of his arrest, and because nothing in the record suggests that Clay either no longer understood those warnings or did not appreciate their applicability to [the parole officer’s] questioning ... the district court did not err in refusing Clay’s motion to suppress.”
 
 Id.
 
 at 222 (footnote omitted).
 

 ¶ 22. We find Adams’s final statement was not rendered involuntary by Investigator Kelly’s failure to re-issue
 
 Miranda
 
 warnings. During the two days prior to the complained of confession, Adams was advised of his rights at least three times, twice orally, and once by a written waiver form signed by Adams. Further, Investigator Kelly testified that he reminded Adams of the prior warnings before obtaining each subsequent statement.
 

 ¶ 23. We also find important that Adams does not argue, nor does the record support, that he indicated at any point that he no longer understood his
 
 Miranda
 
 rights or wished to invoke them. And he does not claim that his written waiver, executed on April 2, was involuntary. Drawing from both Mississippi and federal case law, we reject the notion that the mere lapse of time required renewed warnings where the record is devoid of any indication that Adams no longer understood his rights. Therefore, we find no error in the circuit court’s admission of Adams’s final statement to law enforcement.
 

 II. Prior Suicide Attempts
 

 ¶24. Adams next claims the circuit court prevented him from presenting his theory of defense — that during his suicide attempt, Roberts tried to wrestle his gun away from him, leading to the accidental discharge that killed Roberts. Adams was permitted to testify about his suicide-gone-awry defense, and one of his statements to the police furthering this defense was admitted into evidence. But the State objected based on relevancy when Adams attempted to offer testimony about his pri- or suicide attempts. The circuit court sustained the objection, and Adams’s defense counsel questioned Adams during the following proffer:
 
 [5]
 

 Q. Mr. Riley have you ever attempted suicide before?
 

 
 *439
 
 A. Yes, sir.
 

 Q. When was the first time you attempted to commit suicide?
 

 A. Back in Texas.
 

 Q. How did you attempt to commit suicide?
 

 A. I tried pills. I tried to hang myself. It just wasn’t my time, I don’t guess.
 

 [[Image here]]
 

 Q. Did you ever try to commit suicide by leaving burners on ... a stove?
 

 A. Yes, sir.
 

 Q. When and where was that?
 

 A. A little camp right behind my sister’s house.
 

 Q. When was the next time you tried to commit suicide?
 

 A. I took a handful of pills.
 

 Q. When was that?
 

 A. When I was locked up.
 

 Q. When you were locked up in the Clarke County [J]ail?
 

 A. Yes, sir.
 

 Q. Did you also try to commit suicide . in 1997?
 

 [[Image here]]
 

 Q. Do you remember going to the hospital in 1997, H.C. Watkins?
 

 A. No, sir.
 

 Q. Have you ever been recommended for mental treatment before?
 

 A. They say I have two weeks before this accident. I don’t — I don’t remember it.
 

 [Defense counsel]: That’s all I have for proffer, Your Honor, on that point.
 

 ¶ 25. Though not mentioned by either party, this issue concerns Rule 404(b) of the Mississippi Rules of Evidence. Rule 404(b) provides that evidence of prior acts is not admissible to show a person “acted in conformity therewith,” but it may be admissible for other purposes, including “proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” Our supreme court has adopted a two-part test for the admissibility of evidence under Rule 404(b). First, the evidence must “be relevant to prove a material issue other than the defendant’s character.” Second, “the probative value of the evidence must outweigh the prejudicial effect.”
 
 Davis v. State,
 
 40 So.3d 525, 530 (¶ 16) (Miss.2010). This second prong implicates Mississippi Rule of Evidence 403 — “the ultimate filter through which all otherwise admissible evidence must pass.”
 
 Id.
 

 ¶ 26. In addressing the excluded testimony, we ask whether the evidence was too remote, unspecific or vague to be admitted under Rule 404(b).
 
 See Lesley v. State,
 
 606 So.2d 1084, 1089-90 (Miss.1992) (finding Rule 404(b) evidence was improperly admitted because the evidence was too remote to show a motive for the crime allegedly committed by the accused);
 
 see also Young v. State,
 
 831 So.2d 585, 588 (¶ 6) (Miss.Ct.App.2002) (finding Rule 404(b) evidence was too vague to permit its admission).
 

 ¶ 27. Mississippi Rule of Evidence 401 defines “relevant evidence” as that having “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” “The determination of whether evidence is too remote to be relevant is ordinarily left to the discretion of the trial judge, and his decision will not be reversed in the absence of a clear proof of abuse of that discretion.”
 
 DeHenre v. State,
 
 43 So.3d 407, 415 (¶ 29) (Miss.2010) (quoting
 
 Stewart v. State,
 
 226 So.2d 911, 912 (Miss.1969)).
 

 
 *440
 
 ¶ 28. We find Adams’s proffered testimony is simply too vague and unspecific to support admission.
 
 See, e.g., U.S. v. Winkle,
 
 587 F.2d 705, 710 (5th Cir.1979) (finding offer of proof too unspecific “to make known to the court the [sjubstance of the evidence”); 1
 
 McCormick on Evidence
 
 § 51, at 250 (Kenneth S. Broun et al. eds., 6th ed. 2006) (“[T]he statement constituting the offer of proof must be reasonably specific[.]”). We are also concerned with the lack of identifiable time periods, during which the alleged suicide attempts took place. Adams points to a pretrial examination by a clinical psychologist, Criss Lott, Ph.D. In Dr. Lott’s report, he noted general allegations of past suicide attempts and cited Adam’s medical history, which indicates that in 1996 he had attempted suicide when he “turned on the stove burners without lighting [them] and went to bed.” Though Dr. Lott’s report was marked as an exhibit at a pretrial competency hearing, Adams failed to offer the exhibit, much less mention Dr. Lott’s potential testimony during his proffer. Further, Adams made no attempt at trial to establish the facts in the report, other than vague testimony, which failed to identify any specific time frames when the alleged suicide attempts occurred. Because the proffer certainly does not
 
 permit
 
 that determination, we are left only to speculate about these purported events. Indeed, the only date identified in the proffer was 1997, and Adams did not respond to his attorney’s question about a suicide attempt that may have occurred then. For these reasons, we find no reversible error in the circuit court’s exclusion of Adams’s vague testimony concerning prior suicide attempts.
 

 III. Jury Instruction
 

 ¶ 29. Adams also argues the circuit court erred in denying jury instruction D-6, which proposed:
 

 The Court instructs the jury that if you find from the evidence that at the time the alleged crime was committed, the Defendant had substantially reduced mental capacity, whether caused by, intoxication, substance abuse or any other cause, you must consider what effect, if any this diminished capacity had on the Defendant’s ability to form any of the specific mental states that are essential elements of murder.
 

 Thus, if you find that the Defendant’s mental capacity for whatever reason was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you can not [sic] find him guilty of a willful, deliberate and premeditated murder.
 

 Also, if you find that his mental capacity was diminished to the extent that you have a reasonable doubt whether he premeditated design, you can not [sic] find him guilty of murder.
 

 Further, if you find that his mental capacity was diminished to the extent of premeditated design, nor had an intent to kill at the time of the alleged crime was committed, [sic] then you shall find the Defendant, Riley L. Adams NOT GUILTY.
 

 The circuit judge refused this instruction, finding that it had no adequate evidentiary basis and was not an accurate statement of the law. Because we find the second ground for refusal of the instruction proper, we limit our discussion to that issue.
 

 ¶ 30. A criminal defendant is entitled to jury instructions that present his theory of the case even if the supporting evidence “is weak, inconsistent, or of doubtful credibility.”
 
 Banyard v. State,
 
 47 So.3d 676, 682 (¶ 17) (Miss.2010) (citing
 
 *441
 

 Ellis v. State,
 
 778 So.2d 114, 118 (¶ 15) (Miss.2000)). But a defendant’s right to jury instructions presenting his theory of the case is not absolute.
 
 Harris v. State,
 
 861 So.2d 1008, 1012 (¶ 18) (Miss.2003). “[T]he court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.”
 
 Id.
 
 at 1012-18;
 
 Brown v. State,
 
 39 So.3d 890, 898 (¶ 27) (Miss.2010).
 

 ¶ 31. It is well established that voluntary intoxication is not a defense in Mississippi.
 
 Smith v. State,
 
 445 So.2d 227, 230-31 (Miss.1984). In
 
 McDaniel v. State,
 
 356 So.2d 1151, 1161 (Miss.1978) (Sugg, J., specially concurring), a majority of participating justices found that “[i]f a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts.”
 
 McDaniel
 
 overruled a long line of cases, which had authorized “submission to a jury the question of voluntary intoxication as a defense in specific intent offenses[.]”
 
 Id.
 

 [6]
 

 The supreme court chose instead to follow the common-law rule that voluntary intoxication is not a defense, reasoning that “if a person casts off the restraints of reason and consciousness by a voluntary act, no wrong is done to him if he is held accountable for any crime which he may commit in that condition. Society is entitled to this protection.”
 
 Id.
 
 at 1160-61.
 

 ¶ 32. The supreme court later explained “[t]he
 
 McDaniel
 
 rule prevents ‘submission to a jury the question of voluntary intoxication as a defense in specific intent offenses.’ ■”
 
 Lee v. State,
 
 403 So.2d 132, 134 (Miss.1981). In
 
 Smith,
 
 the court again reaffirmed
 
 McDaniel. Smith,
 
 445 So.2d at 231;
 
 see also Norris v. State,
 
 490 So.2d 839, 842 (Miss.1986) (finding no error in granting a
 
 “McDaniel
 
 rule” instruction to the State that voluntary intoxication is no defense to a crime, where the evidence justified granting the instruction);
 
 Grubbs v. State,
 
 956 So.2d 932, 936-37 (¶¶ 10-13) (Miss.Ct.App.2006) (same).
 

 ¶33. Proposed jury instruction D-6 does not conform to Mississippi law. Instead, it requires the jury to consider Adams’s level of intoxication and whether it affected his ability to form deliberate design to commit murder. The instruction gives the impression that Adams’s intoxication, regardless of the reason for it, is a defense. Indeed, the second paragraph of the instruction provides that if the jury finds “for whatever reason” that the defendant had diminished capacity to the point of creating a reasonable doubt regarding deliberate design, then it must find Adams not guilty. Because this is not the law, we find no abuse of discretion in the circuit court’s denial of the instruction.
 

 IY. Sufficiency and Weight of the Evidence
 

 ¶ 34. Adams finally argues the verdict was not supported by legally sufficient evidence or is against the weight of the evidence. When addressing the legal sufficiency of evidence, we consider all evidence in a light most favorable to the State.
 
 Bush v. State,
 
 895 So.2d 836, 843 (¶ 16) (Miss.2005). Credible evidence consistent with guilt must be accepted as true. The State receives the benefit of all favorable inferences reasonably drawn
 
 *442
 
 from the evidence.
 
 Jones v. State,
 
 20 So.3d 57, 64 (¶ 16) (Miss.Ct.App.2009) (citing
 
 Hughes v. State,
 
 983 So.2d 270, 275-76 (¶¶ 10-11) (Miss.2008)). The jury resolves matters of weight and credibility. Reversal is proper when reasonable and fair-minded jurors could only find the accused not guilty.
 
 Id.
 
 Our primary duty in considering the sufficiency of the evidence is to determine whether from the evidence presented, it would be impossible for a reasonable juror to find the defendant guilty.
 
 Ducksworth v. State,
 
 767 So.2d 296, 301 (¶ 10) (Miss.Ct.App.2000).
 

 ¶ 35. The standard differs slightly when reviewing a claim based on the weight of the evidence challenging a trial court’s denial of a motion for a new trial. Under this standard, “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844 (¶ 18). We evaluate the evidence in the light most favorable to the verdict.
 
 Id.
 
 And we are required to accept as true all evidence consistent with the defendant’s guilt, along with any reasonable inferences that might be drawn from the evidence.
 
 Young v. State,
 
 891 So.2d 813, 821 (¶ 21) (Miss.2005). “[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.”
 
 Bush,
 
 895 So.2d at 844 (¶ 18).
 

 ¶ 36. The jury found Adams guilty of murder in violation of section 97-3-19(l)(a). This section provides that “[t]he killing of a human being without the authority of law by any means or in any manner shall be murder ... [w]hen done with deliberate design to effect the death of the person killed, or of any human being[.]”
 
 Id.
 

 ¶ 37. We find ample evidence to sustain Adams’s conviction. In one typewritten statement, Adams admitted that he shot Roberts. The statement exudes deliberation. It indicates that he and Roberts got into an argument. And after working on a puzzle, he walked to a cabinet, removed his pistol, and proceeded to the bedroom. He sat on the bed, cocked his .22-caliber revolver, then shot Roberts in the neck. Adams’s handwritten statement furthers a somewhat similar narrative—that he and Roberts got into an argument over her taking his “pills,” and he pulled “the tiger [sic].”
 

 ¶ 38. These two incriminating statements, which the jury was free to accept among the many contradictory ones, strongly support the State’s position that Adams acted with deliberate design. “Deliberate design ‘may be formed quickly and perhaps only moments before the act and may be inferred through the intentional use of any instrument which based on its manner of use is calculated to produce death or serious bodily injury.’ ”
 
 Porter v. State,
 
 33 So.3d 535, 541 (11.20) (Miss.Ct. App.2010) (quoting
 
 Wilson v. State,
 
 936 So.2d 357, 364 (¶ 17) (Miss.2006)).
 

 ¶ 39. The jury was also free to draw inferences of guilt from the numerous contradictory statements given by Adams. In addition to his inconsistencies about the shooting, Adams provided several conflicting statements about where authorities might locate the weapon, including that he had thrown it outside in the bushes. Yet a .22-caliber revolver containing five live rounds and one spent casing was eventually found in Adams’s mobile home. Investigator Kelly testified that Adams identified the gun as the weapon that had fired the fatal shot, though Adams denied this at trial.
 

 1140. While the jury heard testimony that particles indicative of gunshot residue were found on both of Adams’s hands and
 
 *443
 
 on one of Roberts’s hands, an expert witness tendered in gunshot-residue analysis explained this bore no indication of who fired the weapon — merely that both were in close proximity to the pistol.
 

 ¶ 41. This case presents a classic jury question replete with credibility determinations. And we are reminded that it is the jury’s role, not ours, to determine the proper weight and credibility to give witness testimony and other evidence.
 
 Moore,
 
 933 So.2d at 922 (¶ 43). Appellate courts “may not pass upon the credibility of witnesses,” and if the evidence justifies a verdict, we must accept it “as having been found worthy of belief.”
 
 Id.
 
 (quotations omitted).
 

 ¶ 42. Viewing the evidence in the light most favorable to the State, we find rational jurors could have found Adams guilty. And taking the evidence consistent with the verdict as true, along with the reasonable inferences to be drawn from that evidence, we find no manifest injustice has occurred.
 

 ¶ 43. THE JUDGMENT OF THE CLARKE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO CLARKE COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ„ CONCUR.
 

 [1]
 

 . Deputy Davis could not identify to whom Adams was speaking.
 

 [2]
 

 . This statement actually bears two dates. It is typewritten that the statement was obtained on April 3, although Adams apparently wrote the date of April 4 next to his signature. According to Investigator Kelly's testimony, Adams signed this statement on April 3.
 

 [3]
 

 . In Adam’s initial suppression motion, he attacked his second typewritten statement given on April 3, 2004, for failure to give
 
 Miranda
 
 warnings. In his amended suppression motion, he seemed to specifically target the same statement, although the exhibit referred to is absent from the record. On appeal, he alleges a different statement — the handwritten statement obtained on April 4 — was involuntarily made.
 

 [4]
 

 . During Investigator Kelly’s direct testimony, he indicated that he read Adams his
 
 Miranda
 
 rights again prior to Adams signing this first typewritten statement, although Investigator Kelly did not have Adams sign another written waiver.
 

 [5]
 

 . We have included the substance of this exchange in its entirety and omitted the argu-merits and ruling on the State's objections to leading the witness.
 

 [6]
 

 . The overruled cases are listed in the appendix to the specially concurring opinion.
 
 Id.
 
 at 1161.