UNITED STATES of America, Plaintiff-Appellee,

v.

Robert Hilton SWANSON and Jack Lavoied Phipps, Defendants-Appellants.

No. 76-3484.

United States Court of Appeals, Fifth Circuit.

May 5, 1978.

Rehearing Denied May 30, 1978.

Charles Van Mottola, Newnan, Ga., (Court-appointed), for Swanson.

John A. Nuckolls, Atlanta, Ga., (Court-appointed), for Phipps.

William L. Harper, U. S. Atty., Glenna L. Stone, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before JONES, GODBOLD and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

Phipps and Swanson were jointly indicted and convicted of conspiracy and extortion through the mails in violation of 18 U.S.C. §§ 371 and 876. Swanson alleges that the evidence was insufficient to support his conviction. Phipps primarily contends that the trial court erred in refusing to grant a continuance because his amnesia concerning the events constituting the crime rendered him incompetent to stand trial. Phipps' other contentions are discussed below. We affirm the convictions.

On February 12, 1976, 28 residents of LaGrange, Georgia, received threatening letters, each stating that a member of the addressee's family would meet a "FATEL [sic] accident" if the addressee did not give $1,000 per month to "a man sent by our company." These frightening communications were the product of what appears from the record to be almost casual planning and participation.

Swanson and Phipps had been introduced by a mutual acquaintance, Adamson. On approximately January 17, 1976, Swanson received a phone call from an unnamed person whom he later identified as Phipps. The caller stated that he had a $2,000 per month job for Swanson. Swanson, after learning enough details to characterize the scheme to his friends as "blackmail," asked the caller to send him a letter outlining the particulars. After a second phone call,

Swanson received an unsigned letter on January 22, 1976, describing his role in the scheme. The letter advised him to attempt to convince several named persons in Carrollton, Georgia, to act as collection agents. Acting according to the instructions in the letter, Swanson tried to telephone Hall, Pike and Dobson. Only Dobson could be located, but he declined the offer of employment after learning a few details.

Further acting according to instructions in the letter, Swanson supplied his mysterious correspondent with the names of 25 LaGrange, Georgia, men with families. Swanson later discussed these men and their financial status over the phone with the person he identified as Phipps. Sixteen of the persons who received extortionate letters were on the list prepared by Swanson.

On February 11, 1976, the postmark date of the extortion letters, Phipps traveled from Carrollton, Georgia, to Thomaston, Georgia, to visit his parents. A letter mailed along the route would have carried the same postmark as the extortion letters. On his way to Thomaston, Phipps visited a former employer, Charles Carter, at his home. The visit, though uneventful, is significant because the extortion letters advised the recipients to "Check the postmark date of this letter and a Carrollton, Ga. newspaper and you will realize the letter was mailed the night before the *FATEL* [sic] accident in the Charles Carter family of Carrollton, Ga." The letters were received by the addressees on February 12. Phipps stayed in Thomaston from February 11 until February 13. Phipps left Georgia for Florida but voluntarily returned to answer questions by the FBI.

The government presented strong circumstantial evidence to connect Phipps to the crime. The letter to Swanson and all the extortion letters bore one or more of Phipps' fingerprints or palmprints on the letter or envelope. The typewriter used for the letters was one to which Phipps had free access. In a spelling test administered by the FBI, Phipps misspelled the same words misspelled in the letters. Moreover, Swanson identified Phipps as his mysterious caller.

### I. Phipps—continuance because of amnesia

Prior to trial Phipps moved for a dismissal.[1] Phipps claimed that he suffered amnesia and was unable to recall the telephone calls to Swanson or mailing the letters, although he had otherwise normal recall of his activities between January 20 and February 12, 1976. Phipps contended that because of his inability to recall crucial events he was unable to participate in his defense and, thus, should not be required to stand trial.

Pursuant to 18 U.S.C. § 4244, Phipps was examined by his own and government psychiatrists. The defense's expert, Dr. Hendry, classified Phipps' inability to remember as hysterical amnesia and diagnosed Phipps as suffering from a dissociated state. Dr. Hendry had administered sodium amytal, a barbiturate, to Phipps. He testified that while under the influence of the drug Phipps was able to recall facts that, were he able to recount them on the stand, would either exculpate him or substantially rebut the government's case. The government psychiatrist did not directly contradict Dr. Hendry, although he testified that one suffering from the more usual sort of amnesia cannot recall anything that occurred during the amnesiac period. The court found Phipps capable of standing trial.

The federal standard for judging competency to stand trial prohibits trial if the court finds the accused to be "presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense. . . ." *Dusky v. U. S.*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), elaborated upon the § 4244 test and held that the

test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of

---

1. The court treated the motion to dismiss as a motion for continuance.

rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

Several constitutional concerns underlie *Dusky* and § 4244. At bottom, § 4244 enforces the due process requirement that no person be convicted of a crime while he is incompetent to stand trial. *See Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Beyond this elemental concern, *Dusky* makes clear that § 4244 also is concerned with protecting an accused's Fifth and Sixth Amendment rights to a fair trial and effective assistance of counsel. *See Wilson v. U. S.,* 129 U.S.App.D.C. 107, 391 F.2d 460 (1968).

■ While bearing in mind these constitutional and statutory issues, we decline, as have all other courts to consider the problem,[2] to hold that amnesia per se constitutes incompetency to stand trial. Rather, recognizing that the fundamental fairness of trying an amnesiac defendant may vary depending on the crime and the circumstances surrounding the claimed loss of memory, we hold that the propriety of trying an amnesiac defendant is a question to be determined according to the circumstances of each individual case.[3]

Although the competency determination cuts to the heart of the trial process, the standard for determining the competency of an amnesiac defendant must remain flexible. Amnesia is a complex condition that may be caused by a variety of factors. *See* Comment, *Amnesia: A Case Study in the Limits of Particular Justice,* 71 Yale L.J. 109 (1961). Because nonpathological amnesia may be difficult to ascertain, the district judge is in the best position to make a determination between allowing amnesia to become an unjustified haven for a defendant and, on the other hand, requiring an incompetent person to stand trial.

The inquiry may proceed on two levels. At the subjective level, the district court may apply the *Dusky* standard and look to the defendant's present ability to consult with counsel and to understand the proceedings against him. In evaluating the propriety of requiring the trial to proceed, the court may additionally consider other factors relevant to the defendant's particular situation. These might include the defendant's present ability to take the stand on matters other than the amnesiac event and whether the defendant suffers from some other pathological or psychological condition apart from the amnesia that hinders his present ability to participate in his defense. *See U. S. v. Wilson, supra.* One important factor is whether a continuance is likely to do any good. Granting a continuance to a defendant whose amnesia has been diagnosed as temporary may materially increase his ability to stand trial. If the amnesiac condition is unlikely to abate, the judge may question whether the defendant will ever be in any better position to stand trial. A presently incompetent defendant may never be able to stand trial and may have to be released. *See Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). On the other hand, a presently competent defendant whose amnesia seems permanent would not benefit from a continuance; moreover, because the continuance would delay the trial the recall of other

---

**2.** *See, e. g., U. S. v. Sullivan,* 406 F.2d 180 (CA2, 1969); *U. S. v. Stevens,* 461 F.2d 317 (CA7), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218 (1972); *U. S. ex rel. Parson v. Anderson,* 481 F.2d 94 (CA3), *cert. denied,* 414 U.S. 1072, 94 S.Ct. 586, 38 L.Ed.2d 479 (1973); *Dhaemers v. Minnesota,* 456 F.2d 1291 (CA8, 1972); *Dye v. Cowan,* 472 F.2d 1206 (CA6, 1973); *U. S. v. Borum,* 464 F.2d 896 (CA10, 1972); *Wilson v. U. S.,* 129 U.S.App.D.C. 107, 391 F.2d 460 (1968).

**3.** In *Wilson v. U. S., supra,* the D. C. Circuit required the trial judge at the close of the trial to make findings of fact that the defendant had demonstrated his competency during the trial. We suggest no standard procedural approach. The initial evaluation will occur in deciding whether to order a competency hearing under § 4244 and in making findings on any competency hearing held. During the course of the trial it may become apparent that the accused is incompetent to stand trial. Because competency is an essential consideration in the fairness of the trial, the court may at any time during or after the trial reevaluate the competency of the accused, with or without a motion by counsel.

witnesses would decrease, making it more difficult to give the amnesiac defendant a fair trial. Finally, the judge can evaluate the nature of the amnesia and the strength of the evidence that the condition is real and not feigned.

The necessity for a continuance should also be considered from the objective standpoint of whether the defendant can receive a fair trial despite his amnesia. Among the relevant questions bearing on fair trial and effective assistance of counsel which the judge might consider are these: Can the crime and the defendant's whereabouts be reconstructed without his testimony? The strength of the case against the defendant may make his own testimony less critical than in a weaker case. Would access to government files help the defendant prepare a defense? If information held by the prosecution could fill in gaps in the defendant's memory, the possibility of prejudice may be lessened.

■ Analyzing the district court's actions in the light of what we have said, we find no reversible error. We conclude that Phipps was able to consult with counsel and to participate in his defense and that he received a fair trial.

Both the psychiatrist for the defense and the psychiatrist for the government agreed that Phipps understood the charges against him and could assist his counsel in preparing and presenting the case. Moreover, because Phipps had good recall of events during the critical period except preparing and mailing the letters, he was able to testify and to present a case in his own behalf. Further, although both psychiatrists agreed that Phipps appeared to have suffered some type of amnesiac episode, it was possible to conclude from their testimony that Phipps could have been feigning memory loss and that, in any case, restoration of the lost memories would not materially aid his defense. The government psychiatrist testified that selective memory loss was uncommon and that if Phipps had been suffering hysterical dissociation, other symptoms, such as an alteration of his behavior, probably also would have been present. The

defense was unable to refute this testimony.

In support of its motion the defense proffered a tape of the interview between Phipps and Dr. Hendry, his psychiatrist, conducted while Phipps was under the influence of sodium amytal administered by Dr. Hendry. The district judge listened to the tape, and the parties agree that parts of it tended to show that Phipps was able to recall that he had discussed the scheme with Swanson and Adamson as a joke or prank. Because Phipps had no conscious memory of the discussion with Swanson and Adamson or the drug-induced interview with Dr. Hendry, he claims that his amnesia denied him the ability to present the exculpatory defense of lack of intent. *See Borum, supra.* We reject this contention for several reasons. First, Phipps' attorney was able to cross-examine both Swanson and Adamson and to fully explore their knowledge of or participation in the scheme. Second, the reliability of the prank theory was questionable because both psychiatrists testified that sodium amytal did not guarantee the veracity of statements made under its influence. Finally, the tape of the sodium amytal interview further undercuts the force of the defense's theory because there is some indication that Dr. Hendry suggested to Phipps that the scheme might have been a joke. Thus, because Phipps' defense was not prejudiced substantially, if at all, the district judge did not err in concluding that a continuance would do little either to restore Phipps' memory or to further assist him in preparing a defense.

II. Phipps—other allegations of error

■ Phipps attempted unsuccessfully to get before the jury the contents of the taped interview between him and Dr. Hendry, referred to above and previously listened to by the district judge. When this attempt was made, Phipps had already testified that he had no present recollection of sending the letters and no present recollection of what he had said in the interview. Phipps' offer of proof and his brief on ap-

peal make clear that what he desired was to get before the jury the part of the tape in which Phipps purported to recall that he had discussed the scheme with Swanson and Adamson as a joke or prank. Also he intended to ask Dr. Hendry whether in his opinion this purported recollection by Phipps reliably reflected what had actually occurred between Phipps and Adamson and Swanson. Arguably this is hearsay and not within any of the exceptions—*see* Fed.R. Evid. 801(c), (d)(1) and Advisory Committee Note to (d)(1), and the exceptions in 803(3), (5) and (24). The statement was made ex parte and without oath. There could be no effective cross-examination of Phipps because already he had testified that he could not recall what he said at the interview. The jury could not judge Phipps' demeanor and credibility at the time the statement was made. As already noted, the tape itself reveals that the interviewing psychiatrist may have suggested the prank theory to Phipps. Moreover, no drug-induced recall of past events which the subject is otherwise unable to recall is any more reliable than the procedure for inducing recall. Here both psychiatrists testified that sodium amytal does not ensure truthful statements. No re-creation or recall, by photograph, demonstration, drug-stimulated recall, or otherwise, would be admissible with so tenuous a predicate.

■ Second, Phipps contends that a motion for mistrial should have been granted because of inflammatory testimony by one of the recipients of the letter. After reviewing the record, we find no statement that could have unduly prejudiced Phipps.

■ Phipps argues that the court should have submitted the issue of insanity to the jury. His counsel withdrew the insanity defense during trial and now suggests either that the court should have submitted the issue sua sponte or, alternatively, that this court should hold that Phipps was denied effective assistance of counsel. Neither of these objections merits reversal. Under Fed.R.Cr.P. 30 failure to object to jury instructions waives the objection. From the failure to object and the earlier

withdrawal of the insanity defense, the trial judge was justified in concluding that Phipps did not want the issue submitted to the jury. *See U. S. v. Mancuso*, 423 F.2d 23 (CA5), cert. denied, 400 U.S. 839, 91 S.Ct. 79, 27 L.Ed.2d 73 (1970); *Lyles v. U. S.*, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958); 362 U.S. 943, 80 S.Ct. 809, 4 L.Ed.2d 771 (1960); 368 U.S. 992, 82 S.Ct. 610, 7 L.Ed.2d 529 (1962). Phipps' contention that he was denied effective assistance of counsel is refuted by the record. Phipps was zealously represented by competent and dedicated counsel of a quality far beyond the minimum constitutional standard. *See, e. g., Herring v. Estelle*, 491 F.2d 125 (CA5, 1974).

■ Finally, Phipps argues that the trial court erred in refusing to sever Phipps' trial from Swanson's under Fed.R.Cr.P. 14. Motions for severance rest in the discretion of the court and will not be overturned without an affirmative showing of abuse of that discretion. *U. S. v. Perez*, 489 F.2d 51 (CA5, 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Moreover, the interest of judicial economy and the policy favoring joint trials in conspiracy cases must be weighed against the defendant's allegations of prejudice. *See id.* The test in this circuit for reviewing the denial of a severance is that the defendant must be unable to obtain a fair trial without a severance and must demonstrate compelling prejudice against which the trial court will be unable to afford protection. *See id., U. S. v. Martinez*, 466 F.2d 679 (CA5, 1972), cert. denied, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). Phipps did not meet this test.

The trial judge instructed the jury that they must return separate verdicts as to each defendant. The jury charge also required that statements made by one alleged conspirator could be considered only as evidence against the person making the statement. The confession of codefendant Swanson, admitted at trial, had all references to Phipps deleted. *See Bruton v. U. S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d

476 (1968); *U. S. v. Hicks*, 524 F.2d 1001 (CA5, 1975), *cert. denied*, 424 U.S. 946, 96 S.Ct. 1417, 47 L.Ed.2d 353; 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 197 (1976). In addition to the prophylactic measures taken by the trial court, Phipps was able to fully cross-examine the codefendant, who took the stand in his own defense.

■ Phipps also contends that severance was required because Swanson's defense was antagonistic to his own. To compel severance, the alleged conspirators' defenses must be not only antagonistic but irreconcilable. *Martinez, supra.* Here, Swanson's defense of noninvolvement did not preempt Phipps' defense of lack of intent. Phipps did not attempt to refute the heavy circumstantial evidence against him, but rather argued that he lacked the requisite intent. Swanson's story of the events leading up to the mailing of the letters was not inconsistent with Phipps' theory.

The denial of severance was not reversible error.

### III. Swanson

■ Although Swanson testified to his own substantial involvement in the scheme, he insists there was insufficient evidence to find that he had the requisite intent to injure required by 18 U.S.C. §§ 371 and 876. Swanson did not see a copy of the extortion letter until a few days after it was mailed to the recipients, so the intent element must be inferred from Swanson's participation in events leading up to the mailing. There is substantial evidence from which the jury could infer that Swanson knew the type of scheme Phipps was planning. After his first telephone conversation with Phipps, Swanson described the scheme as blackmail. The employment letter from Phipps to Swanson contained a number of thinly veiled references to extortion. The letter advised Swanson that his job would be to collect money from citizens in LaGrange. He was to contact two others to participate also, but he was to avoid using his real name. The letter stated that the scheme was illegal. Swanson and the other "bag men" to be recruited by him were each to draw up a list of 25 prominent LaGrange men with families. The family requirement was especially stressed, and Swanson was further instructed to list the number of family members and their names. Finally, the letter stated:

> If you are questioning our ability, let me assure you that we are Professionals and that we will make sure the clients are more than willing to pay us.

Swanson later sent his list of 25 men to a General Delivery address. He and Phipps discussed these names over the telephone, eliminating those without families and those that Swanson felt could not afford $1,000 per month.

The question of a defendant's knowledge of a threat to injure should be submitted to the jury if the evidence tends to show beyond a reasonable doubt that a reasonable person knowing the context of the letter would interpret the extortion letter as a threat to injure. *U. S. v. Maisonet*, 484 F.2d 1356 (CA4, 1973), *cert. denied*, 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974). The judge correctly decided that a reasonable person in Swanson's position would have realized the threatening nature of the scheme he was advancing. Once the issue was properly submitted to the jury, the jury was free to evaluate Swanson's credibility against the government's evidence.

The convictions are AFFIRMED.

GEE, Circuit Judge (specially concurring):

While I concur in the majority's disposition of this case, I cannot agree that a criminal defendant's claim of amnesia must give rise to a case-by-case analysis of his competence to stand trial. In my view the accused's amnesia, insofar as it entails no more than a present inability to recall events at the time of the crime, is in itself insufficient to establish that a criminal defendant is incompetent under 18 U.S.C. § 4244.

As the majority opinion notes, mental incompetency under this statute may be found on a showing that the accused is

"presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense." In its very abbreviated opinion in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court has said that under section 4244 the "test must be whether [a criminal defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

The claim of incompetency, of course, entails considerations quite different from those of the insanity defense. The latter concerns the defendant's ability to control his acts at the time of the crime, whereas the former concerns our unwillingness to try one who is at least figuratively "absent" from the proceedings: just as we decline to try a criminal defendant who is not present to face his accusers, so do we decline to try one who cannot comprehend the nature or significance of his accuser's charges and actions. Clearly the main purpose of section 4244 is to assure that a criminal defendant can comprehend the proceedings against him and can rationally communicate to his attorney his own wishes and views on such strategic decisions as his defense may present. Just as clearly, this main purpose is not necessarily defeated by a criminal defendant's lack of recall about the events of the crime, since his amnesia entails neither present insanity nor present inability to understand the proceedings and communicate with his attorney.

Our only question, then, is whether section 4244 as interpreted by *Dusky* encompasses some further purpose in addition to this main purpose of assuring present comprehension and ability to communicate at trial. In particular, we might ask whether the defendant's ability to assist in his own defense means that he must be able to relate his own version of the facts of the crime, either to his attorney or to the trier of fact or to both. The majority opinion seems to say that the *Dusky* test in itself entails no such further purpose; rather, the

majority states that beyond *Dusky* the trial court is to consider other factors "additionally." These factors in addition to *Dusky* revolve chiefly about the defendant's ability to testify and about the nature and strength of the evidence against him.

In insisting that the trial court take into account these evidentiary factors—whether or not they are a part of the *Dusky* test—the majority opinion parallels some cases from sister circuits that are at least mildly sympathetic to the claim of amnesia as a ground for incompetence. Their sympathy, too, appears to derive chiefly from the view that a defendant's competence—or at least his right to a fair trial—includes some consideration of his ability to state his own remembered version of the facts of the crime, particularly where his entire defense must be constructed from that version, and cannot be reconstructed from other evidence. *See, e. g., United States ex rel. Parson v. Anderson*, 481 F.2d 94 (3d Cir. 1973); *United States v. Borum*, 464 F.2d 896 (10th Cir. 1972); *Wilson v. United States*, 129 U.S.App.D.C. 107, 391 F.2d 460 (1968).

It is my view that these evidentiary considerations, important though they may be to the construction of a criminal defense, have no bearing on a defendant's competence to stand trial. The Seventh Circuit, in *United States v. Stevens*, 461 F.2d 317 (7th Cir.), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 218 (1972), rejected the view taken by the majority today and in so doing discussed some of the chief weaknesses of the majority's position. The *Stevens* opinion pointed out that the defendant's memory—or rather the loss thereof—is no different in kind from the loss or lack of any other potentially exculpatory evidence. Thus, the defendant may have been alone at the time of the crime; or his chief alibi witness may die or abscond. Certainly the absence of the favorable evidence that would have existed, had these events been other than what they were, cannot render the defendant incompetent. By the same token, his own lapse of memory may destroy evidence that might have substantial-

ly assisted him in the construction of his defense. But the absence of this evidence, serious though it may be, does not render a defendant incompetent to stand trial.[1]

I readily concede that a criminal defendant's inability to remember the events of the crime may indeed present him with significant evidentiary impediments in the construction of his defense—although the same may be said of the death of a key alibi witness. But this is at most a ground for more extensive criminal discovery, or perhaps even for a continuance where it can be shown that his memory is improving and that a delay will not contribute substantially to the decay of other evidence. These, however, are matters for the proper conduct of the trial proceedings. *See United States v. Sullivan*, 406 F.2d 180 (2d Cir. 1969). They ought not be elevated into grounds for a finding of incompetence—a finding which, as the majority correctly notes, may mean that the defendant must be released without any trial at all.

I am especially persuaded of this view by two practical considerations. One is the extraordinary commonness of forgetfulness and, most particularly, forgetfulness of unpleasant or anxiety-provoking events. Retrograde amnesia is common and known to be so. *See Sullivan, supra* at 186. In holding that a criminal defendant may be found incompetent to stand trial simply because he cannot recall events at the time of a crime, we may well make a substantial dent in the presumption of every defendant's competence. Second, I cannot but note the ease with which a claim of amnesia can be advanced and the difficulty of testing a particular defendant's claim where he asserts no more than his inability to recall the events at the time of the crime. I fear we are planting dragon's teeth, that in future many defendants who do not plan to testify will advance this new bar to trial routinely.

In other circuits several cases raising this claim have involved defendants who suffered from some other malady that could reasonably be viewed as bearing a causal relation to the purported amnesia. Thus, in *Wilson*, the case most sympathetic to the amnesia claim, the defendant had been critically injured in an auto chase immediately following the crime and had indeed been unconscious for some three weeks thereafter. The defendant in *Sullivan* claimed that his inability to recall resulted from his heavy alcoholism; the defendant in *Stevens* claimed that his sustained and heavy drug use had caused his memory lapses. I have no doubt that mental shocks alone may cause mental deficiencies quite as severe as these physical ailments. But requiring the presence of some causative physical manifestation might at least arguably give the court a concrete basis for believing that the asserted amnesia is genuine and that it may be of a serious nature; even in such cases the courts have by no means uniformly credited the amnesia claim. But where, as in this case, there is no accompanying malady and no concrete benchmark whatever, a case-by-case analysis of each amnesia claim is an invitation to fraud. A criminal defendant has temptation enough to fraud as it is. We ought not encourage him further.

I would hold that the bare claim of amnesia cannot form the basis for a finding of incompetency.

---

1. In addition, I must express my skepticism that a defendant's entire defense can ever rest solely upon his ability to relate his version of the facts, either to his attorney or to the trier of fact. The burden is always on the government to present sufficient evidence to convince the jury of the defendant's guilt, and it is always open to the defendant to attempt to impeach the government's evidence.