ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Scott County Circuit Court found Timothy Joseph Patterson guilty of murder. The circuit court sentenced Patterson to life in the custody of the Mississippi Department of Corrections (MDOC). Patterson appeals and claims: (1) the circuit court erred when it denied his request for a manslaughter instruction; (2) he had ineffective assistance of counsel; (3) the circuit court erred when it held that he would not be permitted to claim as a defense that he was insane, because he had not timely notified the prosecution of his intent to raise a defense based on insanity; (4) the circuit court erred when it held that he was competent to be tried; (5) there was insufficient evidence to convict him of murder; (6) the jury’s verdict is contrary to the overwhelming weight of the evidence; and (7) he should be awarded a new trial based on the cumulative effect of the circuit court’s errors. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Patterson graduated from Belhaven University on May 8, 2010. That night, he met with some of his friends from high school, who had planned to watch a pay-per-view fight at a “barn” that Jim Marler owned in Scott County.[1] Approximately twelve to fifteen people went to Marler’s bam. Most of the attendees were drinking. By 2:30 a.m. the following morning, there were still a few people remaining. Marler, Patterson, Luke Baugh, Kevin Gordon, and Michael Guy drove to a couple of different locations to socialize, one of which was Tracy Arinder’s farm. They did not stay at Arinder’s farm long, because Marler and Arinder began to argue. According to Marler, he was walking away from Arinder when Arinder hit him from behind. Arinder caused Marler to hit his head on the running board of his truck. Guy did not leave with Marler’s group. There was some indication that Guy did not approve of Marler’s disagreement with Arinder.
¶ 3. Marler, Patterson, Kevin Gordon, and Baugh drove back to Marler’s barn. Gareth Henry and Kevin Gordon’s brother, Ken Gordon, arrived at Marler’s barn sometime around 3:00 a.m. Patterson was holding a semi-automatic pistol that Mar-ler owned. Marler testified that Patterson must have taken the pistol out of Marler’s truck, but Patterson later disputed that. In any event, witnesses testified that Patterson was not behaving aggressively at that time. A short time later, Patterson fired Marler’s pistol into the air. Because Patterson was inebriated, Baugh took the pistol from Patterson, removed the magazine from the pistol, ejected an unfired round from the pistol’s chamber, and left the pistol on a table. The magazine changed hands, but it was eventually hidden away from Marler’s pistol.
*1128 ¶4. In the meantime, Guy got a ride back to Marler’s barn. Patterson had picked up Marler’s pistol again, and he somehow found the hidden magazine. Five eyewitnesses testified that without any provocation from Guy or any indication of a dispute between Guy and Patterson, Patterson suddenly shot Guy in the head at point-blank range. Patterson then turned around toward a group of bystanders and fired the pistol once in their general direction. Fortunately, Patterson did not hit any of the bystanders, who quickly scattered out of Marler’s barn. However, Patterson then turned back around, stood over Guy, and shot Guy in the head again.
¶ 5. Meanwhile, Henry ran to his truck and armed himself with his own pistol while trying to call 911. Marler ran to his brother’s house and also called 911. Patterson had tucked Marler’s pistol into the waistband of his shorts. As Patterson walked toward Henry, Henry warned Patterson to stay where he was. As Henry kept his pistol aimed at Patterson, Ken Gordon removed Marler’s pistol from Patterson’s waistband. Patterson reportedly said that he wanted to kill himself. Henry kept Patterson in one spot until law-enforcement officers were able to respond to the scene.
¶ 6. Deputy Sheriff Brad Ellis of the Scott County Sheriffs Department was the first responder at the scene, although other law-enforcement officers arrived shortly after Deputy Ellis. Deputy Ellis and Officer Jimmy Scott Thompson of the Morton Police Department took Patterson into custody. Investigator Willie Anderson swabbed Patterson’s hands for gunshot residue. Jacob Burchfield of the Mississippi Crime Laboratory later found that particles of gunshot residue were present on the samples that Investigator Anderson had taken. Additionally, Patterson’s fingerprints were retrieved from Marler’s 9mm pistol.
¶ 7. Patterson was indicted for murder. He pled not guilty and opted for trial. Four days before Patterson was scheduled to go to trial, Patterson’s trial attorney submitted notice that Patterson intended to claim that he had been insane when he shot Guy. And just before Patterson’s trial commenced, his trial attorney moved for a continuance based on the concept that Patterson was incompetent to be tried. The events that transpired during Patterson’s competency hearing will be discussed later. Suffice it to say, the circuit court denied Patterson’s motion for a continuance based on the circuit court’s conclusion that Patterson was competent to be tried. The circuit court also granted the prosecution’s motion to preclude Patterson from raising a defense based on insanity because Patterson had provided insufficient notice of his intent.
¶ 8. At trial, the prosecution presented numerous eyewitnesses who testified that Patterson had shot Guy. Those eyewitnesses also testified that Patterson and Guy had not been arguing or acting in any way that could have provoked Patterson’s behavior. The prosecution also called numerous law-enforcement officers and expert witnesses who testified regarding their involvement in the investigation that followed.
¶ 9. Patterson called several character witnesses, who all testified that Patterson was a peaceful, honest person. Additionally, Patterson took the stand. He testified that he could not remember shooting Guy. According to Patterson, he had only met Guy that night, but they had gotten along well. However, he remembered that Guy did not leave Arinder’s barn with Marler because Guy had sided with Arinder. Patterson admitted that he had been drinking that night. He could not confirm or deny *1129 that he had killed Guy, but he speculated that someone could have possibly drugged one of his drinks.
¶ 10. The jury found Patterson guilty of murder. The circuit court sentenced Patterson to life in the custody of the MDOC. Following unsuccessful post-trial motions for a judgment notwithstanding the verdict (JNOY) or a new trial, Patterson appeals.
ANALYSIS
I. MANSLAUGHTER INSTRUCTION
¶ 11. Patterson claims the circuit court erred when it refused his request to instruct the jury that it could find him guilty of manslaughter. Patterson submitted a two-page proposed jury instruction designated as D-6. The circuit court gave the first page of instruction D-6. However, the circuit court refused the second page of instruction D-6, which stated:
If the State has failed to prove beyond a reasonable doubt that ... Patterson acted willfully, with malice aforethought[,] and with premeditated design, then you are to not find [Patterson] guilty of murder; however you should continue your deliberations to consider elements of the crime of manslaughter.
If you find from the credible evidence in this case beyond a reasonable doubt th[at] ... Guy was a living person and that ... Patterson did kill ... Guy but without malice or premeditated design, by the use of a deadly weapon, not in necessary self-defense[,] at a time when he had the mental capacity to know right from wrong, and without authority of law, then you may find ... Patterson[ ] guilty of manslaughter.
If the State has failed to prove any one or more of the elements of manslaughter beyond a reasonable doubt, then you shall find [Patterson] not guilty of manslaughter.
The circuit court refused the second page of instruction D-6 because there was no evidence to support a manslaughter instruction. Patterson claims the circuit court’s decision prohibited him from presenting his defense theory that he lacked deliberate design to kill Guy.
¶ 12. Whether to give or refuse proposed jury instructions is within the sole discretion of the circuit court. Victory v. State, 83 So.3d 370, 373 (¶ 12) (Miss. 2012) (citation omitted). An appellate court reviews the circuit court’s decision according to the abuse-of-discretion standard. Id. Additionally, we review the jury instructions as a whole, without singling out one individual instruction. Id. “A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.” Id. (citation omitted). “If the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.” Id.
¶ 13. On appeal, Patterson does not indicate which manslaughter theory his instruction was intended to address. That is, Patterson does not argue that the evidence warranted an instruction that he acted in the heat of passion. See Miss. Code Ann. § 97-3-35 (Rev.2006) (“The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.”) Similarly, Patterson does not claim that he acted with culpable negligence when he killed Guy. See Miss. Code Ann. § 97-3-47 (Rev.2006) (“Every *1130 other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter”). Patterson seems to argue that he was entitled to a manslaughter instruction because the jury could have found that he did not kill Guy with malice aforethought or deliberate design.
¶ 14. “Lesser-included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense.” Hobson v. State, 730 So.2d 20, 26 (¶ 22) (Miss. 1998) (citation omitted). There was no evidentiary basis that would have allowed the jury to find Patterson guilty of manslaughter but not guilty of murder. Five eyewitnesses testified that they saw Patterson shoot Guy in the head without any provocation. Five eyewitnesses also testified that Patterson then stood over Guy and shot him in the head again. Patterson testified that he did not remember shooting Guy. There was no evidence that Patterson acted in the heat of passion, with culpable negligence, or in any manner of self-defense. Under the circumstances, if the jury would have found that Patterson did not kill Guy with malice aforethought or deliberate design, the proper resolution would not have been to find that Guy was guilty of manslaughter. Under those circumstances, the jury should have found that Guy was simply not guilty of murder. Because there was not an evidentiary basis to support a manslaughter instruction, we find that the circuit court acted within its discretion when it denied Patterson’s request. It follows that there is no merit to this issue.
II. INSANITY DEFENSE
¶ 15. Patterson’s trial was scheduled for Tuesday, January 18, 2011. A state holiday fell on the Monday before Patterson’s trial. On Friday, January 14, 2011, Patterson filed a motion for a continuance based on the concept that he was not competent to stand trial. The circuit court heard Patterson’s motion the same day that Patterson filed it. During that hearing, Patterson’s defense team never mentioned any intent to rely on an insanity defense.
¶ 16. After the hearing, Patterson filed a notice of intent to present an insanity defense. The prosecution filed a motion in opposition and argued that Patterson should not be allowed to present an insanity defense. The prosecution noted that Patterson had failed to comply with the notice requirements of Rule 9.07 of the Uniform Rules of Circuit and County Court. The prosecution further noted that it had several conversations with Patterson’s defense team to determine whether Patterson intended to rely on an insanity defense. According to the prosecution, in December 2010, Patterson’s defense team had indicated that Patterson would not rely on an insanity defense. Finally, the prosecution noted that because the following Monday was a state holiday, the prosecution would have no time to rebut Patterson’s insanity defense. Ultimately, the circuit court held that Patterson would not be allowed to present an insanity defense because Patterson had failed to provide timely notice of his intent to do so.
¶ 17. Patterson claims the circuit court erred. According to Patterson, the prosecution had more than ten days’ notice that Patterson intended to present an insanity defense, because sometime between Christmas 2010 and New Year’s Eve, Patterson had informed the prosecution that he intended to call Dr. Mark Webb as a witness. Patterson also argues that the circuit court should have considered some *1131 lesser sanction other than preclusion of his insanity defense, although Patterson does not suggest an appropriate lesser sanction. Regardless, Patterson argues that the circuit court’s decision violated his Sixth Amendment right to compulsory process and his Fifth Amendment due-process right to present his defense theory to the jury.
1118. Rule 9.07 provides, in part:
If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, the defendant shall, within the time provided for filing pretrial motions or at such later time as the court may direct, serve upon the prosecuting attorney and the clerk of the court a written notice of the intention to offer a defense of insanity. If there is a failure to comply with the requirements of this subsection, the court may use such sanctions as it deems proper, including:
1. Granting a continuance, and, in its discretion, assessing costs against the appropriate attorney or party;
2. Limiting further discovery of the party failing to comply;
3. Finding the attorney failing to comply in contempt; or
4. Excluding the testimony of appropriate witnesses.
The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.
Within ten days thereafter, but in no event less than ten days before the trial unless the court otherwise directs, the defendant shall serve upon the prosecuting attorney the names and addresses of the witnesses upon whom the defendant intends to rely to establish the defense of insanity.
Patterson’s trial attorney gave the prosecution notice of Patterson’s intent to rely on an insanity defense on the Friday before Patterson’s trial, which began on a Tuesday following a state holiday. Furthermore, Patterson’s trial attorney later explained that although he consulted with a psychiatrist and a psychologist, both experts had opined that Patterson did not have a viable insanity defense. However, shortly before Patterson’s trial was scheduled to commence, psychiatrist Dr. Mark Webb met with Patterson and concluded that Patterson was legally insane at the time of Guy’s death based on the volume of alcohol Patterson had consumed. Patterson’s trial attorney filed his insanity-defense notice “just in case,” but Patterson’s trial attorney later explained that he did not think that Patterson had a viable insanity defense because Dr. Webb’s opinion was based on voluntary intoxication, which is not an acceptable defense in Mississippi. “It is well established that voluntary intoxication is not a defense in Mississippi.” Adams v. State, 62 So.3d 432, 441 (¶ 31) (Miss.Ct.App.2011) (citing Smith v. State, 445 So.2d 227, 230-31 (Miss.1984)).
¶ 19. Additionally, sometime between the previous Christmas and New Year’s Eve, Patterson had given the prosecution notice of his intent to call Dr. Webb as a witness. However, Patterson never elaborated on the scope of Dr. Webb’s anticipated testimony. It was certainly not within the time contemplated in Rule 9.07 when Patterson finally indicated that Dr. Webb was anticipated to testify that Patterson was legally insane at the time that he killed Guy. Based on the foregoing, we do not find that the circuit court erred when it prohibited Patterson from relying on an insanity defense. It was within the circuit court’s discretion to do so, considering Patterson’s last-minute notice. Furthermore, the circuit court’s decision did not preju *1132 dice Patterson because Patterson’s insanity theory was based on his voluntary intoxication, which is not a legitimate defense in Mississippi. Therefore, there is no merit to this issue.
III. COMPETENCY
¶ 20. Prior to Patterson’s trial, the circuit court conducted a hearing to determine whether Patterson was competent to stand trial. During that hearing, Dr. Webb testified that Patterson perceived and understood the nature of the proceedings that he faced. Dr. Webb also testified that Patterson was capable of consulting with his attorneys with a degree of rational understanding. According to Dr. Webb, Patterson had no psychiatric problems. Regardless, Dr. Webb testified that Patterson was not competent to stand trial because Patterson claimed that he could not remember shooting Guy. Dr. Webb opined that Patterson’s claimed memory loss was due to Patterson’s consumption of alcohol on the night that Guy was killed.
¶ 21. Officer Thompson also testified during Patterson’s competency hearing. Officer Thompson testified that when he arrived at the scene, Patterson said, “Oh, God, what have I done?” Officer Thompson further testified that Patterson said, “I shot him.” According to Officer Thompson, Patterson told him where he could find Marler’s pistol. Dr. Webb testified that he was unaware of Patterson’s statements to Officer Thompson when Dr. Webb concluded that Patterson was not competent to stand trial. Dr. Webb admitted that Patterson’s statements to Officer Thompson “would tend to go against what Mr. Patterson has been saying.” Dr. Webb further admitted that Patterson’s statements to Officer Thompson did “draw into question” whether Patterson’s claimed loss of memory was genuine or feigned.
¶ 22. The circuit court held that Patterson was competent to stand trial. Patterson claims that the circuit court erred. According to Patterson, his “inability to recall the shooting severely hampered his ability to assist his counsel in his defense.” Patterson also argues that his claimed loss of memory “obviously impaired his ability to testify in his own defense.” Patterson concludes that the circuit court’s decision that he was competent to stand trial resulted in the denial of his rights to due process.
¶ 23. The Mississippi Supreme Court has held:
It is a denial of due process and contrary to public policy to try a defendant when it appears to the trial court that there is a probability that [the] defendant is incapable of making a rational defense. When the competency of [the] defendant to stand trial is raised, the trial court should conduct a hearing pri- or to the trial to determine whether there is a probability that the defendant is incapable of making a rational defense. If the trial court finds that there is not sufficient proof to show a probability that [the] defendant is incapable of conducting a rational defense, he should make such finding a matter of record. The case may then proceed to trial on the merits. [An appellate court] may not overturn that finding unless [it] was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that the defendant is incompetent to stand trial.
Bridges v. State, 807 So.2d 1228, 1230 (¶ 10) (Miss.2002) (citations and quotations omitted).
¶24. Patterson is a college graduate. There was no evidence that he had any psychological or psychiatric disorders that would have prevented him from “conduct *1133 ing a rational defense.” Patterson’s lack-of-competency argument is based entirely on the premise that although he could remember the night of Guy’s death until near the moment Guy was killed, he could not remember whether he had actually killed Guy. Furthermore, Patterson claimed his loss of memory was related solely to his voluntary alcohol consumption.
¶ 25. This is an issue of first impression in Mississippi, as neither this Court nor the Mississippi Supreme Court has addressed this precise question. However, the Fifth Circuit has declined “to hold that amnesia per se constitutes incompetency to stand trial.” United States v. Swanson, 572 F.2d 523, 526 (5th Cir.1978). Instead, the Fifth Circuit held that “the fundamental fairness of trying an amnesiac defendant may vary depending on the crime and the circumstances surrounding the claimed loss of memory....” Id. Consequently, the Fifth Circuit held in Swanson that “the propriety of trying an amnesiac defendant is a question to be determined according to the circumstances of each individual case.” Id. “Because nonpathological amnesia may be difficult to ascertain, the [trial] judge is in the best position to make a determination between allowing amnesia to become an unjustified haven for a defendant and, on the other hand, requiring an incompetent person to stand trial.” Id.
¶ 26. In Swanson, the Fifth Circuit stated that a trial court should consider whether granting a continuance would impact an amnesiac defendant’s ability to testify at a later date. Id. Specifically, the Fifth Circuit said that “[granting a continuance to a defendant whose amnesia has been diagnosed as temporary may materially increase his ability to stand trial.” Id. However, “a presently competent defendant whose amnesia seems permanent would not benefit from a continuance ... because ... the recall of other witnesses would decrease, making it more difficult to give the amnesiac defendant a fair trial.” Id. at 526-27.
¶27. Prior to Patterson’s trial, Dr. Webb testified that he could not “state to a reasonable degree of certainty that [Patterson] would ... ever be able to recall those facts.” Dr. Webb added, ‘We’re now approximately eight months, nine months out. I don’t think they’re going to come back.” Stated differently, Dr. Webb opined that Patterson was unlikely to recollect his lost memories of the precise moment that Guy was killed. To reiterate, Patterson was able to remember much of the evening that Guy was killed, but he claimed that he could not remember the precise moment when Guy was killed. Patterson did not deny that he killed Guy. Patterson simply testified that he could not remember that moment. However, five other eyewitnesses were able to remember that moment. They all consistently testified that without provocation, Patterson shot Guy in the head. They all testified that Patterson then stood over Guy and shot him in the head again.
¶ 28. We note the following portion of the Rhode Island Supreme Court’s reasoning in a similar case:
Inevitably in this jurisdiction and others[,] persons will be charged with crimes for which they have no memory. The causes of their amnesia may vary from psychological or physical trauma to drug or alcohol-induced blackout.... [L]ack of memory in murder cases has been a common and frequent defense. Although the expressions differ, they all amount to the same thing. Cases abound with commonly used statements or testimony by a person accused of murder that “I don’t remember anything”; “my mind went blank”; “I blacked out”; “I panicked and don’t re *1134 member what I did or anything that happened.” Our criminal codes have been born of the societal interest in apprehending and punishing those who are guilty of serious crimes. We do not wish to provide a means of evading trial to those who are charged with criminal activity but cannot recall such activity owing to fortuitous circumstances or otherwise.
State v. Peabody, 611 A.2d 826, 832 (R.I. 1992) (footnote and citations omitted). Facing a similar question, the Texas Court of Criminal Appeals has stated that “no case yet reported has held that the inability to recall the event charged because of amnesia constitutes mental incapacity to stand trial.... ” Morris v. State, 301 S.W.3d 281, 292 (Tex.Crim.App.2009). Consequently, the Morris court compared “a defendant’s amnesia ... to ‘missing’ evidence.” Id. at 293. According to the Morris court:
In his plight, the amnesiac differs very little from an accused who was home alone, asleep in bed, at the time of the crime or from a defendant whose only witnesses die or disappear before trial. Furthermore, courts, of necessity, must decide guilt or innocence on the basis of available facts even where those facts are known to be incomplete, and the amnesiac’s loss of memory differs only in degree from that experienced by every defendant, witness, attorney, judge, and venireman. How much worse off is a generally amnesic defendant on trial for murder, for example, than one who remembers all but the dispositive fact: who struck the first blow?
Id. Ultimately, the Morris court held that “there was ample evidence that [the] appellant was competent to stand trial because he had (1) a sufficient present ability to consult with the lawyer with a reasonable degree of rational understanding; and (2) a rational as well as factual understanding of the proceedings against him.” Id. at 294.
¶ 29. We do not find that the circuit court’s decision that Patterson was competent to stand trial was manifestly against the overwhelming weight of the evidence. The circuit court heard Dr. Webb’s expert testimony that Patterson perceived and understood the nature of the proceedings that he faced. Dr. Webb also testified that Patterson, a college graduate, was capable of consulting with his attorneys with a degree of rational understanding. Patterson had no psychiatric problems. Additionally, Dr. Webb testified that Patterson’s claimed loss of memory was unlikely to change. That is, Dr. Webb testified that Patterson was unlikely to recover the memories that he claimed to have lost. There is no merit to this issue.
IV. INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 30. Patterson claims his three retained trial attorneys — Thomas Royals, Thomas Mayfield, and Constance Slaughter-Harvey — rendered ineffective assistance for multiple reasons. In general, we should address the merits of an ineffective-assistance-of-eounsel claim on direct appeal only when “(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.” Robinson v. State, 68 So.3d 721, 723 (¶ 10) (Miss.Ct.App.2011) (citation omitted). However, Patterson’s appellate counsel called Royals as a witness during the hearing on Patterson’s post-trial motions. The record contains Royals’s explanations regarding his strategy during Patterson’s trial. In any event, on direct appeal, “[rjeview ... of an inef *1135 fective-assistance-of-counsel claim is confined strictly to the record.” Id.
¶ 31. Patterson must prove: (1) his counsel’s performance was deficient, and (2) the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In so doing, Patterson faces the “strong presumption that counsel’s performance falls within the range of reasonable professional assistance.” Robinson v. State, 68 So.3d at 723 (¶ 9). To overcome that presumption, Patterson “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id.
¶ 32. “When determining if both prongs of the Strickland test have been met, deficient performance and resulting prejudice from those deficiencies, this Court must look to the totality of the circumstances.” Payton v. State, 708 So.2d 559, 563 (¶ 12) (Miss.1998).

A.Admission that Patterson Shot Guy

¶ 33. According to Patterson, during closing arguments, Royals was ineffective because he admitted that Patterson shot Guy. Patterson claims Royals essentially conceded that Patterson was guilty of murder. Patterson’s argument is based on the following portion of Royals’s closing argument:
Here, what you have is a world of explanations, a world of reasons to believe that there has not been a murder here. Something else caused ... Patterson’s behavior. Not meanness, not a spirit to kill, not a robbery, not hate, not jealousy; something that we don’t know about that maybe somebody put a trick on him, dropped something in his drink. He went crazy, he started shooting.
¶ 34. We disagree that Royals conceded Patterson’s guilt. Royals argued that Patterson did not kill Guy with deliberate design. Consequently, Royals argued that Patterson was not guilty of murder. There is no merit to this allegation.

B. Involuntary-Intoxication Instruction

¶ 35. Next, Patterson argues that his trial attorneys-were ineffective in that they did not request an involuntary-intoxication instruction. Patterson speculated that someone could have possibly put some drug in one of his drinks to cause him to shoot Guy. But there was no evidence that Patterson was involuntarily intoxicated. Consequently, there was no evidence to support an involuntary-intoxication jury instruction. A circuit court may refuse a jury instruction that has no foundation in the evidence. Victory, 83 So.3d at 373 (¶ 12). Patterson’s trial attorneys’ decision not to pursue a jury instruction that had no evidentiary basis did not prejudice Patterson. There is no merit to this issue.

C. Untimely Notice of Patterson’s Insanity Defense

¶ 36. Finally, Patterson claims his trial attorneys were ineffective because they did not timely put the prosecution on notice that Patterson would rely on an insanity defense. However, during the hearing on Patterson’s motion for a JNOV, Royals explained his decision not to pursue an insanity defense. Royals testified that he did not pursue an insanity defense for multiple reasons. Specifically, Royals explained:
First of all, Dr. Webb, as you notice from his report, never identified any major mental illness in [Patterson] which would have compromised his capacity to distinguish right from wrong *1136 or to impair his competency to stand trial. Secondly, Dr. Webb’s conclusion was that he was basically suffering from an alcoholic blackout. I have dealt with insanity defense[s] before, and I do know that in Mississippi!!,] voluntary intoxication is neither a defense nor a mitigator. So I was aware of that. But, as you said, I gave the notice just in case....
... I think in addition to the notice issue, ... [the trial judge] would have had an alternative reason for excluding the testimony — his testimony, that being that voluntary intoxication is not a defense to a criminal action in Mississippi.
[[Image here]]
And I’m also not sure that had it come to that, that I could have — as an officer of this [c]ourt[,] that I could have asserted [an insanity] defense with a straight face[,] to be honest with you.
[[Image here]]
Because, first of all, Dr. Webb didn’t identify ... what the psychiatrists call [a] major mental disorder. He didn’t identify that. And, secondly, his conclusion was that the reason [Patterson] could not recall [shooting Guy] was because [Patterson] was in a blackout induced by voluntary ingestion of alcohol.
[[Image here]]
[I did not pursue an insanity defense b]ecause I’ve seen those defenses before where the [defendant forgets what happened or tries to use alcoholism or something as an insanity defense. That just do[es]n’t work. You’re going to get convicted when you’re using that defense. ... I’ll tell you, the two best trial strategies I know after [forty] years [of experience] is they have to prove beyond a reasonable doubt and that there’s the presumption of innocence. And I always use those two strategies and try to show that the defendant did not commit the crime, if I can.
¶ 37. Royals clearly explained that he did not pursue an insanity defense as a matter of trial strategy. Dr. Webb’s opinion was based entirely on the premise that Patterson was essentially insane due to the volume of alcohol that he had consumed. “It is well established that voluntary intoxication is not a defense in Mississippi.” Adams, 62 So.3d at 441 (¶ 31) (citation omitted). We find that Patterson’s trial attorneys’ tactical decision not to pursue an extremely weak, if not nonexistent, insanity defense in lieu of a relatively stronger defense did not prejudice Patterson. There is no merit to this issue.
V. SUFFICIENCY OF THE EVIDENCE
¶ 38. Patterson claims there was insufficient evidence to support the jury’s verdict. The Mississippi Supreme Court has stated:
[I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for [a] directed verdict or for [a JNOV], the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction .... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable [jurors] could not have found beyond a reasonable doubt that the defendant was *1137 guilty, the proper remedy is for the appellate court to reverse and render.
Bush v. State, 895 So.2d 886, 843 (¶ 16) (Miss.2005) (internal citations and quotations omitted). However, this Court will determine that there was sufficient evidence to sustain the jury’s verdict if the evidence was “of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions on every element of the offense....” Id. (citations and quotations omitted).
¶ 39. According to Patterson, there was insufficient evidence that he shot Guy with deliberate design to kill him. “[U]nless one expresses his intent, the only method by which intent may be proven is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident.” Boyd v. State, 977 So.2d 329, 335 (If 23) (Miss.2008) (citation omitted). Furthermore, one’s “intent to do an act or commit a crime is ... a question of fact to be gleaned by the jury from the facts shown in the case.” Id. Five eyewitnesses testified that Patterson shot Guy in the head from close range. One witness testified that Patterson “just walked back in the barn and walked straight up to [Guy], facing him, and just pulled the gun up and fired it.” Furthermore, Ken Gordon testified that as he was running from Marler’s barn, he looked back and saw Patterson standing over Guy “with the gun pointed down.” Ken Gordon testified that he yelled, “Joe, don’t do it!” According to Ken Gordon, Patterson looked at him “and then [Patterson] just looked back down and shot [Guy] again.” Because there was undisputed testimony that Patterson shot Guy once in the head, and then stood over Guy and shot him in the head a second time, there was sufficient evidence for the jury to conclude that Patterson deliberately killed Guy. There is no merit to this issue.
VI. WEIGHT OF THE EVIDENCE
¶ 40. Next, Patterson claims the jury’s verdict is contrary to the overwhelming weight of the evidence. Patterson’s reasoning in this issue is the same as his reasoning in his issue regarding the sufficiency of the evidence. That is, Patterson claims the overwhelming weight of the evidence supports the conclusion that he did not kill Guy with deliberate design.
¶ 41. This Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18) (citation omitted). The supreme court has further instructed that when reviewing a trial court’s decision to deny a motion for a new trial:
The motion ... is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict. However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, ... the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Id. (footnote, internal citations, and quotations omitted).
¶ 42. Viewing the evidence in the light most favorable to the verdict, the jury *1138 could have reasonably concluded that Patterson had deliberate design to kill Guy. Allowing the jury’s verdict to stand would not sanction an unconscionable injustice. Therefore, we find no merit to this issue.
VII. CUMULATIVE EFFECT
¶ 43. According to Patterson, the cumulative effect of the errors committed during his trial requires that we reverse the circuit court’s judgment and remand this matter for a new trial. Patterson seems to suggest that there was some form of a conspiracy against him.[2] Patterson claims that the trial judge was the college roommate of Marler’s father. However, the trial judge expressly denied that he and Marler’s father had ever been roommates. Patterson insinuates that the trial judge “hurried and rushed along” Patterson’s trial to mitigate the likelihood that Marler would have to pay Guy’s family damages incident to a civil trial. Patterson also seems to suggest that the circuit court should have transferred the venue of the trial and sequestered the jury. However, Patterson does not cite any legal authority to support his allegations. Issues unsupported by authority are procedurally barred from appellate review. Cantrell v. State, 830 So.2d 654, 657 (¶ 9) (Miss.Ct. App.2002). Moreover, Patterson’s allegations are not supported by the record. Our review must be confined to what appears in the record. Pulphus v. State, 782 So.2d 1220, 1224 (¶ 15) (Miss.2001).
¶ 44. We have found no errors. It follows that there can be no cumulative effect of errors that do not exist. Harrison v. State, 49 So.3d 80, 85 (¶18) (Miss.2010). There is no merit to this issue.
¶ 45. THE JUDGMENT OF THE SCOTT COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Marler owned a large metal building that was equipped with electricity, running water, and satellite television. Marler did not house animals in the building. He used the building to store and repair outdoor equipment. However, the record indicates that witnesses consistently referred to Marler’s building as a "bam.”

. For example, Patterson’s brief contains allegations that his "defense [was] usurped from underneath him by the trial judge under color of the usual courtroom drama and switche-roo, subject to games played behind the scenes by the good-ole-boy justice system.” Patterson also suggests that he was subjected to:
the subliminal controls over courts by egotistical roustabouts who dictate the balance of power for courtroom justice by tipping the scales with their personal whims and caprice set into motion by a few good-ole-boy comrades with cocksure grins having connections that lay under protection of darkness and behind-the-scenes play, the interest and monies of a few who have an antithesis interest to the defendant.